Charles FISHER, Edward Holohan, John Harris, Ledgure Davis, Lionel Lawson, Victor Ellis, John Thompson, Milton Gadson, individually and on behalf of all other persons similarly situated, Plaintiffs,

v.

Richard KOEHLER, Commissioner of the Department of Correction of the City of New York; James T. Garvey, Supervising Warden of C–76; Bruce Sullivan, Warden of C–76; David C. White, Deputy Warden for Administration at C–76; Lloyd Freckleton, Deputy Warden for Security at C–76; James Kane, Deputy Warden for Programs at C–76; Steven Thomas, Assistant Commissioner for Health, Education and Social Services for the Department of Correction; Steven C. Joseph, Commissioner of the Department of Health; Allan Goldberg, Director of Prison Health Services for the Department of Health; Mel Kaye, Ph.D., Director of Mental Health Services for Prison Health Services; Dr. Murray Rosenthal, Director of Dentistry of the Department of Health; Edward Koch, Mayor of the City of New York, Defendants.

No. 83 Civ. 2128(MEL).

United States District Court, S.D. New York.

July 14, 1989.

The Legal Aid Soc., Prisoners' Rights Project, New York City, for plaintiffs; Philip L. Weinstein, John Boston, Claudette R. Spencer, Dale A. Wilker, of counsel.

Peter L. Zimroth, Corp. Counsel of City of New York, New York City, for defendants; Diane J. Morgenroth, Asst. Corp. Counsel, of counsel.

LASKER, District Judge.

In a decision of July 13, 1988 after a lengthy trial, I found that the plaintiff class of inmates confined at the New York City Correctional Institution for Men ("CIFM") had established that violence at CIFM by both staff and inmates against inmates had "reached proportions that violate[d] the Eighth Amendment." *Fisher v. Koehler*, 692 F.Supp. 1519, 1521 (S.D.N.Y. 1988) (footnote omitted). Specifically, it was concluded that

> [s]ystematic deficiencies in the operation of CIFM, most significantly, overcrowding, overreliance on open dormitory housing, lack of adequate classification, inadequate staffing and supervision, and inadequate systems for controlling, investigating and disciplining misuse of force, have led to a world where inmates suffer physical abuse, both by other inmates and by staff, in a chillingly routine and random fashion.

*Id.* Looking to the guidance of *Dean v. Coughlin*, 804 F.2d 207 (2d Cir.1986), in which the court vacated the injunction adopted by the district court to address constitutional violations reflected in the state prison's dental care system, I conclud-

ed that it would be inappropriate to fashion a decree without first giving the defendants "an opportunity to submit a reasonable plan for the court's consideration." *Fisher*, 692 F.Supp. at 1567.

The parties have since, consistent with that decision, submitted proposed orders, that have been increasingly refined in response to counter-proposals. In addition, the parties have articulated the rationale for their differences in the many hours of conferences held to discuss the general principles embodied in, as well as the specific language of, the proposed orders. Finally, in order to better evaluate the sufficiency of the defendants' proposed order, particularly as it concerned staffing, the court revisited CIFM, to gain insight into the current context in which the proposals would be implemented.

The decree that is being filed today has been fashioned only after thorough consideration of the responsible proposals and argument of the parties. Consistent with *Dean*, it reflects many of the defendants' proposals. The order proposed by the Department of Correction ("the Department") was unquestionably "carefully and conscientiously formulated" and it represents a tremendous commitment of resources and creativity on behalf of the Department. *Dean*, 804 F.2d at 215. Accordingly, it is entitled to deference. As *Dean* cautions, the courts must "give the state a reasonable opportunity to remedy a constitutional deficiency, imposing upon it a court-devised solution only if the state plan proves to be unfeasible or inadequate" to eliminate the constitutional violations. *Id.* at 213.

Nevertheless, many of the proposals reflected in the plan are yet untested and accordingly their efficacy to cure the distressing and unconstitutional level of violence at CIFM remains subject to question. In some instances, plaintiffs, armored with this court's factual findings, have persuasively argued that, while the defendants' plan may provide the basis for relief, certain modifications are necessary to assure compliance with minimum constitutional requirements.

The issues presenting the most difficult questions as to the sufficiency of the defendants' proposal and the reason for the adoption or modification of the defendants' language are discussed below, both to provide an explanation for the nature of the remedy and as background and guidance for the future occasions in which the decree's terms may be reviewed.

## A. CLASSIFICATION

As stated in the factual findings of the decision of last year,

> [t]here is no dispute that lack of classification at CIFM has been a significant cause of violence there. Classification reduces violence because violent inmates are less likely to commit violent acts against others like themselves, and because, once violent inmates are identified and grouped, it is possible to take appropriate control measures such as putting them in single cells and making changes in staffing and programming.

*Fisher*, 692 F.Supp. at 1547. There is no question that the remedial decree must provide for adoption of a classification system that separates inmates based on their level of violence and needs for protection. During the period of discussion, the parties have reached agreement on many of the specific provisions of a classification system, including the information that will be recorded and reviewed to determine the inmate's classification, the basic interview process, and the need to remove from dormitory housing those with a history of particularly violent and predatory behavior. However, two significant differences have required court decision and merit discussion at this time: the criteria by which to determine whether an inmate must be housed in a cell and the propriety of housing protective custody inmates in dormitories.

The parties agree that inmates with "significant histories of violence" must be housed in cells, rather than dormitories, to assure the safety of others, but disagree as to the nature and number of incidents that constitute a "significant history." Whereas the plaintiffs have proposed that no

inmate who has been convicted either once of assault or three times of fighting in the last three years shall be housed in a dormitory, defendants propose to exclude inmates from dormitory housing after one conviction for an assault or fight that results in serious physical injury, two that result in physical injury, or three such convictions regardless of the existence or level of a resulting injury. Thus, where plaintiffs' criterion rests on the distinction between assaults and fights, defendants' emphasize the extent of injury.

It is true, as plaintiffs argue, that the extent of injury caused by a fight is "somewhat fortuitous" and that adoption of defendants' criterion would permit, for example, an inmate who has been convicted of one fight that resulted in the need for sutures or hospitalization to remain in dormitory housing. However, I am not persuaded that the distinction between fighting and assault presents fewer difficulties. As plaintiffs themselves have argued, it is often not clear when and if an inmate is the aggressor and it is therefore difficult to distinguish between an assault, loosely defined as an attack without immediate provocation, and a fight, which is a less one-sided incident. Moreover, the plaintiffs' criterion, like the defendants', leaves open the possibility that an inmate whose violent behavior caused injury requiring hospitalization will remain in dormitory housing because the inmate's violence was a response to provocation. Thus, the "climate of fear and intimidation"[1] that plaintiffs seek to redress may persist with adoption of either the plaintiffs' or defendants' criteria. Accordingly, under the standards of *Dean*, the defendants must be given an opportunity to demonstrate, if they can, that their criteria are adequate.[2]

[blank] The decree also adopts defendants' proposal to house protective custody inmates in dormitories, despite plaintiffs' strong disagreement.[3] This determination was not reached without consideration of the earlier finding that "protective custody dormitories at CIFM [had] not provided adequate protection" and of the testimony at trial of plaintiffs' expert James Shoultz that dormitories are unsuitable for protective custody inmates. 692 F.Supp. at 1528, 1529. However, I am convinced that the plan, as proposed by the defendants and modified in the decree, addresses these problems. The decree provides for exclusion from protective custody of those inmates with a significant history of violence and for cell housing of those inmates whose vulnerability or history of violence requires their separation.[4]

## B. CROWDING

[blank] Overcrowding at CIFM was found to be one of five factors that significantly contributed to CIFM's unconstitutional level of violence. 692 F.Supp. at 1540. At trial, plaintiffs' experts testified persuasively that crowding, particularly in open dormitories, causes stress, which can manifest itself in violence. During the trial, CIFM's average daily population was in the range of 2500–2600. *Id.* at 1541. CIFM's present official capacity is 2112, but, as was true during the trial, CIFM's population routinely exceeds capacity.[5] Plaintiffs have urged the court as part of the injunctive relief to limit CIFM's population by prohibiting the housing of more than 50 inmates in a dormitory, a limitation that would cap CIFM's population at almost 300 fewer than its official capacity and require displacement of almost 500 inmates presently housed at CIFM pursuant to its variances.[6]

---

1. Plaintiffs' Response to Defendants' Second and Third Affidavits in Support of Defendants' Proposed Order at 9 (May 23, 1989).

2. See ¶ 4.

3. See ¶ 8.

4. *Id.*

5. The Department has received variances from the New York City Board of Correction and the New York State Commission of Correction permitting its population to exceed official capacity.

6. Affidavit of Richard J. Koehler in Support of Defendants' Proposed Order at 19 (Dec. 2, 1988).

Despite plaintiffs' forceful and rather impassioned arguments that this requirement is necessary, I have declined at this time to impose that limit on CIFM's population, although the decree does set an outer limit, in any event, of 2600.[7] The Department has persuasively argued that, before such a limitation is imposed, the Department should be given an opportunity to establish that it can reduce the level of violence at CIFM to a constitutionally acceptable level by addressing the other major sources of violence, particularly with adoption of and refinements to their classification system.

It may very well be true, as plaintiffs have argued, that classification and crowding relief address different aspects of the problems of violence found to plague CIFM: crowding causes stress that affects all kinds of people but classification addresses the characteristics of particular people, regardless of their setting. In that respect, by failing to limit CIFM's present population as requested by plaintiffs, the defendants' plan—and thus this injunctive relief—risks failing to address and eliminate an identifiable source of violence. However, as *Dean* emphasizes, the court has authority only "to assure compliance with minimum constitutional requirements;" the defendants cannot be required to adopt a model plan. *Dean*, 804 F.2d at 215. It cannot be said at this point that, absent a population limit approaching the restrictiveness of plaintiffs', the defendants' proposal as modified does not "provide a reasonable remedy" to reduce the level of violence to a constitutionally satisfactory level. Moreover, although economic costs are not an acceptable excuse for failing to remedy unconstitutional conditions, a court nevertheless has the responsibility of making sure, particularly at a time of community economic burdens such as the present, that no cost that is not demonstrably necessary to remedy constitutional deficiencies is imposed on a community. Accordingly, this decree provides the defendants an opportunity to establish whether their "more delicate instrument"

will suffice to remedy CIFM's unacceptable level of violence. *Id.* at 213.

Three additional comments about the provisions addressing crowding are appropriate. First, the present terms of the decree, specifying that each inmate be afforded a minimum of sixty square feet, would if strictly enforced require CIFM to house several hundred fewer inmates than are there today. However, as the decree's terms provide, the Department is authorized to maintain CIFM's present population, so long as it does not exceed 2600, for the initial six months after the effective date of this decree.[8] The failure of the decree to require the defendants to reduce the present CIFM population at this time does not render the square footage limitation meaningless, since it governs the dormitories not currently operating above capacity pursuant to the terms of a variance. Moreover, and most important, the clause permitting the defendants to operate CIFM at its present population will undoubtedly be among those to be reviewed when the decree's effectiveness is initially considered six months from its effective date. Should the level of violence remain unacceptably high despite the adoption of other new measures reflected throughout this decree, the permissible population will likely be further limited.

Second, use of double bunks is not prohibited. However, in order to address the finding that the bunk beds impaired visibility, 692 F.Supp. at 1549, the decree prohibits use of double bunks that interfere with or obstruct sight lines from the officer's station.[9] Based on the Department's representations and my own familiarity with the lay-out of the dormitories, some bunks could be placed in the dormitory so as not to interfere with the officer's sight lines. It may be that this provision, like that of paragraph ten specifying the space to be afforded each inmate, will effectively limit CIFM's population to fewer than 2600 inmates. Knowing this, I nevertheless decline to modify this provision, as I have

7. See ¶ 10.

8. See ¶ 10.

9. See ¶ 12.

done with the square footage requirement, even for the initial six months of the decree's enforcement. The trial findings indicate that incidents of violence often took place when the assailant knew or thought it likely that his act would not be observed. The classification system is not a substitute for the need that the inmate's actions be continually monitored. Moreover, the need for unimpaired sight lines is particularly important in light of the court's deference to a number of the defendants' staffing requests, particularly those that do not require a permanent second officer in the dormitories housing inmates classified as low and in the medium classification dormitories during the day,[10] as well as the provision which permits the second officer to leave the dormitory for short periods.[11]

■ Third, the order prohibits the housing of inmates in receiving rooms, gymnasiums, and other common areas.[12] Although, as the defendants point out, this issue may not have been formally litigated, it is within the court's authority to adopt such a proposal to prevent those areas from being used to hold inmates for an extended period with the possible result of frustrating the requirement that inmates be promptly classified.

## C. SYSTEMS FOR CONTROLLING USE OF FORCE

The 1988 decision identified four problem areas that contributed to the use of excessive force at CIFM: "1) defendants' use of force policy; 2) training of correctional officers on use and misuse of force; 3) investigation and monitoring of misuse of force; and 4) officer discipline for misuse of force." 692 F.Supp. at 1551.

### 1. Use of Force Policy and Training

■ The provisions of the decree that address the use of force policy and training require development of a new, improved directive on the use of force and provide for more comprehensive training throughout an officer's career. These provisions are largely uncontroversial. The only significant exception[13] involves the terms of paragraph 25, which addresses the staffing of the probe and response teams which were found to use excessive force. 692 F.Supp. at 1538. Plaintiffs argued that the teams should consist of individuals specifically designated for the role, rather than those simply assigned to particular posts who may or may not be level-headed in emergency situations. The decree does not require the Department to name in advance the members of its emergency team: The logistical difficulties of the plaintiffs' proposal are not insignificant and this level of detail appears at this time to intrude unnecessarily into the daily administration of the prison. However, the remedy does go further than the defendants' proposal to ensure exclusion from the probe and response teams of those with any history of excessive use of force. Unlike the defendants' proposal, the decree creates a presumption that not only those charged with a misuse of force, but also those who fail to report it, shall be excluded for three years, rather than simply during the time of any penalty that is imposed.

### 2. Investigation and Monitoring of Misuse of Force

■ There has been no dispute between the parties that the Department should adopt a policy directive, provide special training as to investigation, assign a supervisor from the Department's Investigations and Discipline Unit ("IAD") to review the investigative reports of incidents at CIFM, and send all reports of use of force to a central office. What has been seriously contested is the remedy appropriate to address the court's finding that "the current system of investigations by housing captains is seriously flawed and produces poor results." 692 F.Supp. at 1555. Plaintiffs'

---

10. See ¶ 37(a), (b).

11. See ¶ 40.

12. See ¶ 14.

13. There were of course other disputes concerning, for example, the level of detail about the use of force manual appropriate for the order and the nature of the requirement that the officers demonstrate proficiency in self-defense techniques on an annual basis.

expert at trial attributed the flaws to the many duties of the housing captains, their lack of formal training, and their lack of objectivity prompted by institutional bias. *Id.* at 1554.

Plaintiffs have argued that, in addition to requiring formal training, the decree should mandate that supervisory personnel independent of the institutional chain of command, rather than housing captains, investigate all uses of force in the first instance. Defendants contended that plaintiffs' proposal was unnecessary and counterproductive: Officers' accountability to their superiors, whether captains or the Warden of CIFM, would be undermined were initial investigations conducted by outsiders. Moreover, according to the defendants, the institutional bias will be checked by the independent review of the investigations by IAD, as well as by the newly created post of assistant deputy warden ("ADW") who will report to IAD.

It may be true, as plaintiffs emphasize, that institutional bias would be more effectively addressed by having someone independent of the chain of command prepare rather than review the investigative report. However, the Department has persuasively argued that preservation of the chain of command is important to any effort to curb the officers' excessive use of force. The Department's administration follows a military model and any deviation from the chain of command may diminish the involvement and accountability of officers and captains. Therefore, consistent with *Dean,* the defendants are entitled to an opportunity to show that the increased training and additional layer of independent review, both marked improvements from the time of trial, will cure the deficiencies found at trial.

### 3. Officer Discipline

■ The discipline process at CIFM was found to be plagued with problems:

There are long delays at every stage, including service of the complaint. In many instances, after cases are filed no action is taken until the officer agrees to plead guilty with a light penalty or voluntarily resigns. There are ... sometimes complete failures to act on investigative findings that force was misused. Sometimes departmental charges are never initiated because the officer is given a command discipline....

692 F.Supp. at 1556. Vincent Nathan credibly testified that, when punishment was so unlikely, it failed to serve its purpose of deterring inappropriate conduct. *Id.* at 1556–57.

To redress this problem, the decree requires the defendants to have resolved or be prepared to try disciplinary charges within 90 days of the incident or of the time in which they learned of the incident.[14] One of the four specified exceptions was the subject of dispute, namely that allowing later resolution where an outside law enforcement agency is investigating the incident or pressing criminal charges against the accused officer. The injunction adopts this exception, but with a modification to address the plaintiffs' concerns.

The plaintiffs objected to the consequences of, not the reasoning for, deference to an outside law enforcement agency's investigation.[15] Because the Department may suspend an officer for only thirty days, while a criminal investigation or prosecution may continue considerably longer, the extension of time for trial might permit an officer alleged to have misused force to remain in his or her post for a significant period without protection for the inmates. This is particularly troubling because those incidents that are the subject of an outside investigation are likely to be the most serious or at least among them. To prevent this result, the decree requires that, during the pendency of an outside investigation or prosecution, the officer

---

14. See ¶ 34.

15. The Department defers its investigation and proceeding in such instances to prevent creation of material that would have to be disclosed pursuant to the Jencks Act, 18 U.S.C. § 3500, or *People v. Rosario,* 9 N.Y.2d 286, 213 N.Y.S.2d 448, 173 N.E.2d 881 (1961), both of which require the government to provide defense counsel copies of all prior statements of government witnesses after completion of their direct testimony.

charged with misuse of force or failure properly to report its misuse shall be placed in an assignment without inmate contact.[16]

## D. STAFFING AND INMATE SUPERVISION

The evidence at trial "indicate[d] serious flaws in CIFM staffing and ... demonstrated a connection between inadequate staffing and the occurrence of inmate-inmate violence." 692 F.Supp. at 1550 (footnote omitted). In particular, with limited staffing, ample opportunities existed for violence in the dormitories when only one officer was present, in the cell areas when the supervising officer was shared by two cell corridors, in the stairs during unescorted movement, and in all areas when staff left for meals or other duties without relief. *Id.* at 1549–50.

The defendants have proposed that dormitory staffing vary with classification: for example, dormitories housing low classification inmates would have one permanent and one shared officer during the evening and midnight tours of duty, whereas high classification dormitories would always have two officers. Plaintiffs contend that safety requires that every dormitory have two full-time officers.[17] It is argued that the configuration and size of the dormitories prevents an officer in the officer's station from seeing activity throughout the dormitory.

█ On the recent tour of CIFM, prompted by the difficulty of assessing the staffing proposals on paper, I observed the structure of the dormitory, with particular attention to the sight lines from the officer's station. The combination of the officer's administrative duties and physical placement present substantial obstacles to observing the entire dormitory. As a result, the staffing provisions of the decree require that a second officer be placed in each medium security dormitory during the evening and midnight shifts when many inmates are in the dormitory, rather than, as defendants have proposed, providing that the second officer tour two medium classification dormitories.[18] However, I have declined to modify the nature of the defendants' proposed staffing for low classification dormitories, in part based on the defendants' representation that the officer's station will be moved to enhance visibility into the dormitories, but also because I conclude under *Dean* that the defendants are entitled to an opportunity to establish that a periodic rather than permanent presence may prove sufficient to prevent violence in dormitories consisting of those inmates with little or no history of assaultive behavior.[19] I have, nevertheless, modified the defendants' proposed daytime staffing levels in dormitories housing low and medium classification inmates. The decree requires that, in addition to the permanent officer proposed by defendants, a second officer tour these dormitories during the day. A single officer is unlikely to be able to observe and prevent the violence found to plague CIFM, given the sight lines, the officer's need to perform administrative work, and the continued presence of inmates in the dormitory throughout the day who do not work.

These levels of staffing apply when inmates are housed at sixty square feet. The decree requires increases in staffing consistent with increases in population.[20] The increases required are consistent with the Department's present policy, with one exception. Currently, a third officer is not added in any dormitory until the inmate

**16.** See ¶ 35.

**17.** Plaintiffs maintain that adoption of their staffing proposal would not alter the present staffing at CIFM, whereas the defendants' would constitute a reduction. It is true that no dormitory at CIFM as of May 31, 1989 was staffed by fewer than two officers; however, no dormitory at CIFM was housing low or medium classification inmates at sixty square feet.

**18.** See ¶ 37(b).

**19.** See ¶ 37(a).

**20.** Although paragraph 38 addressing staffing increases is meant to apply primarily to housing affected by a variance, its provisions also apply to the two dormitories the population of which reaches seventy even when inmates are afforded sixty square feet in the sleeping area.

population reaches one hundred. However, the decree requires a third officer in a dormitory housing high classification inmates whenever the population exceeds seventy. It would be inconsistent with the findings of the court and the provisions of this decree to permit as many as ninety-nine inmates, who have a known history of violence, to be housed in a dormitory with only one officer to patrol the sleeping area. Moreover, as a matter of common sense, it would be inappropriate not to increase the staffing in high classification dormitories when the population soars from fifty-eight (the number of inmates that can be housed in a standard dormitory at CIFM with sixty square feet) to ninety-nine, given the added anxiety the crowding itself may cause.

The decree adopts the defendants' proposals for staffing in the stairwells and modular dormitories.[21] During the tour, I observed movement in the stairwells with staffing at the level proposed in the order and viewed the configuration of the modular dormitories. I concluded that the level of staffing in the stairwells, given the increased control officers have over inmate movement in those areas because of modifications made to the physical structure since trial, appeared adequate.

After speaking with an officer in a modular dormitory and observing the sight lines from the officer's station as well as in the sleeping area, I was persuaded that the Department should be permitted to establish, if it can, that violence will be reduced to a constitutionally acceptable level if the modular dormitories are staffed with one officer in each sleeping area and one officer in the officer's station.[22] It is true that there is no place in the officer's station from which one can see into both dormitories at the same time. However, the report of the officer on duty in the officer's station in the modular toured by the court supported the proposition that one officer in the station, aided by the officer in each

sleeping area, gives the staff sufficient opportunity to observe and control the inmates' actions.[23]

### E. MONITORING AND ENFORCEMENT

As this discussion reflects, many of the provisions of the decree are subject to future reexamination. Although they are responsive to the problems found to be significant causes of CIFM's unconstitutional level of violence and logical underpinning, they are in large part untested. As a result, the conditions at CIFM will have to be carefully monitored and certain terms will inevitably need to be revisited. Accordingly, the terms of this decree and its effectiveness shall be reviewed after six months. Either party may at that time move for modification of the decree on the ground, in the case of the plaintiff, that one or more provisions are insufficient to accomplish the purposes of the decree, or, in the case of the defendants, that one or more provisions are unnecessary for these purposes.

### JUDGMENT

Plaintiffs having brought this action on March 19, 1983, challenging certain conditions of confinement at the New York City Correctional Institution for Men ("CIFM") as violative of their rights under the United States Constitution; and the parties having stipulated this case as a class action by order of June 16, 1983, the class consisting of all inmates in City custody who are or will be confined in or receive services from CIFM or any of its annexes including the so-called outer dormitories or building, or North Facility, and a sub-class consisting of detainees; and the court having heard the plaintiffs' application for preliminary injunction and consolidated the hearing with a trial on the merits of the separate issue of violence in June, 1987; and the court having found in its decision of July 13, 1988 that the violence at CIFM reached

---

**21.** See ¶ 44.

**22.** See ¶ 37(d). Plaintiffs had proposed that there be two officers in the station at all times.

**23.** See also paragraph 40 mandating that officers in the sleeping area not be removed to

perform administrative or other routine work and requiring that when the officer must leave the sleeping area, the officer in the station shall constantly survey the housing area.

levels that violated the Eighth Amendment; and the court having reviewed the proposed decrees submitted by the parties and having heard argument as to their merits and limitations; it is hereby

ORDERED, ADJUDGED and DECREED that the terms of this Judgment shall from this date forward, unless modified by this court, govern the defendants' operation of CIFM:

## I. CLASSIFICATION

1. The defendants shall classify all incoming inmates at CIFM on the basis of a classification system that is consistent with this order and will house them according to their classification. Low, medium, and high classification inmates who are housed in general population shall be housed separately according to their classification levels except as set forth below. "General population" shall not include those in punitive segregation, administrative segregation, and protective custody, or those placed in detoxification, mental health, or medical housing pursuant to a decision by a medical or mental health professional. Parole violators, inmates serving state prison sentences, new admissions, unassigned inmates, and adolescent inmates shall be considered general population inmates unless they fall into one of the above enumerated categories or another of defendants' special housing categories. Nothing in this paragraph shall prevent the Department of Correction ("the Department" or "DOC") from identifying and declaring new categories of special housing population.

2. Each inmate admitted to CIFM shall be interviewed by a member of defendants' classification staff or a member of the defendants' court detention staff. The staff member shall elicit the information required by defendants' Arraignment Identification and Initial Classification Screening, Form 239 (ARC) (annexed to this order as Appendix A) or its successor, in an interview conducted in a setting which provides the inmate a modicum of privacy. Each inmate admitted to CIFM shall be advised, promptly after admission, of his classification and shall be informed of its implica-

tions in an interview with a member of defendants' classification staff designated to review Form 239 identified above. Each inmate admitted to CIFM shall also be informed during orientation of the operation of the classification system.

When advised of his classification, the inmate shall have the right to call to the attention of the classification staff member any mistakes of fact upon which the classification is based and any additional information that he believes should have been considered in deciding his classification. Should the inmate dispute any of the facts upon which his classification is based, the classification staff shall ensure that the disputed fact is verified to the extent practicable or shall modify the classification appropriately. Any inmate who disputes the facts underlying the classification shall be housed according to the original classification assigned him until the necessary investigation has been completed.

3. The defendants' classification system at CIFM shall provide:

a. A new classification level—incomplete—shall be established for all inmates for whom there is insufficient information to make a classification decision upon intake. Until the requisite information is obtained, an inmate shall remain in the incomplete classification and shall be housed and supervised like an inmate who has been classified in the high category. Where possible, inmates classified "incomplete" shall be separately housed from inmates classified as high security. Defendants shall make every effort to ensure that inmates do not remain in the incomplete classification for more than 15 days after admission.

b. For classification purposes, there shall be a daily review of warrant logs, infraction disposition records, and change of status records. As warranted, inmates will be reclassified.

c. Commencing within 30 days of the entry of the Court's order, all CIFM inmates shall be reviewed for possible reclassification every 90 days.

d. Within 30 days of the entry of the court's order, the case of any inmate about to be released from punitive segregation will be individually reviewed to determine an appropriate housing placement. The review shall include scrutiny of the facts of the infraction that resulted in the punitive segregation placement and any prior infractions received during his stay at CIFM.

e. Within 30 days of the entry of the court's order, the defendants shall compile histories of disciplinary convictions for violent or serious infractions, including assault, fighting, weapons possession, nonconsensual sex, theft and extortion, committed by all inmates incarcerated at CIFM since January 1, 1988. Records of each such infraction shall be maintained for three years and shall be taken into account in any classification decision made during the inmate's current incarceration or during any subsequent incarceration of the inmate at CIFM.

f. Beginning within 30 days of the entry of the court's order, the disciplinary records of all inmates who are admitted to CIFM directly from another Departmental facility shall be sent to CIFM with the inmates and shall be taken into account in the computation of the inmates' initial classification scores.

g. Effective November 1, 1989, defendants shall begin compiling a record of disciplinary convictions for violent or serious infractions, including assault, fighting, weapons possession, nonconsensual sex, theft, or extortion by inmates incarcerated in any Departmental jail. Such records shall be maintained for three years and shall be taken into account in the classification of any inmate subsequently incarcerated at CIFM.

h. New York State Information Division ("NYSID") reports for CIFM inmates shall be reviewed to note inmates' prior histories of criminal convictions, if any, during the preceding five years, and such convictions shall be taken into account in the computation of inmates' classification scores. Multiple convictions of violent offenses shall be weighed more heavily than single such convictions.

4. Inmates with significant histories of violence shall not be housed in CIFM dormitories. Specifically, no inmate who within the preceding three years has been convicted in a disciplinary hearing within DOC of any of the following shall be housed in a dormitory:

(a) fighting or assault that results in the stabbing/slashing or attempted stabbing/slashing of another person,

(b) fighting or assault that results in serious physical injury or disfigurement of the victim,

(c) fighting that involves a weapon where the inmate's actions exhibited an intent to cause serious physical injury or disfigurement of the victim,

(d) nonconsensual sexual activity, or

(e) stabbing, slashing, rape, assault, or fighting with staff.

No inmate who within the preceding three years has been the subject of two or more disciplinary convictions within DOC for any one or combination of the following shall be housed in a dormitory at CIFM:

(a) fighting or assault where the inmate's behavior resulted in physical injury or disfigurement or exhibited an intent to cause serious physical injury or disfigurement of the victim,

(b) nonconsensual sexual activity, or

(c) an attempt to stab, slash, rape, assault, or fighting with staff.

In addition, no inmate who within the preceding three years has been the subject of three or more disciplinary convictions within DOC for any one or combination of the following shall be housed in a dormitory at CIFM:

(a) fighting or assault resulting in minor or no injury,

(b) extortion,

(c) theft, or

(d) weapons possession.

The Department retains the discretion to house any other inmate in a cell, should it be necessary for the safety of the inmates in the institution.

Defendants shall modify their classification procedures and criteria so as to carry

out the requirements specified above. The department-wide disciplinary record system shall be implemented no later than November 1, 1989. The provisions of this paragraph shall govern both the initial placement of inmates admitted to CIFM and the continued housing of inmates who after admission are convicted of the conduct described above.

Defendants may promulgate criteria and procedures providing that certain inmates subject to this provision may be returned to dormitory housing after no less than 90 days of good behavior in cell housing. Such criteria and procedures shall be submitted to the court for approval no less than 30 days before their planned implementation.

5. The defendants shall house administrative and punitive segregation and maximum security inmates in cells.

6. The Department shall continue its policy that inmates whose housing assignments are changed because of their commission of a violent infraction shall not be transferred to dormitories holding inmates awaiting assignment or to dormitories holding low security inmates.

## II. PROTECTIVE CUSTODY

7. A member of defendants' classification staff shall personally interview all prospective candidates for protective custody ("PC") and recommend appropriate housing.

8. The classification "protective custody" shall include inmates who (a) have been placed into protective custody as a result of a court order; (b) are identified as being at risk in less protective housing because of the nature of their offense or because they are public figures, law enforcement personnel, or informants; (c) are more likely to be at risk in less protective housing because of their stature, appearance, mannerisms, or because they are otherwise potential victims; or (d) have known enemies in the facility or system and cannot otherwise be separated from those enemies.

To ensure the safety of those housed in protective custody, inmates with a demonstrated history of violent, exploitative, or predatory behavior shall not be housed in protective custody. Specifically, no inmate who has been convicted in a DOC disciplinary hearing of

(a) fighting or assault that results in the stabbing/slashing or attempted stabbing/slashing of another person,

(b) fighting or assault that results in serious physical injury or disfigurement of the victim,

(c) fighting that involves a weapon where the inmate's actions exhibited an intent to cause serious physical injury or disfigurement of the victim,

(d) nonconsensual sexual activity,

(e) stabbing, slashing, rape, fighting or assault on staff,

(f) extortion, or

(g) assault while housed in protective custody

shall be housed in protective custody. Similarly, no inmate who has been convicted two or more times in a disciplinary hearing within DOC for fighting or assault or three or more times for theft or weapons possession shall be housed in protective custody. The Department shall retain the discretion to exclude from protective custody housing any other inmate whose violent, exploitative, or predatory behavior necessitates so doing.

Those inmates otherwise eligible for protective custody housing whose violent, exploitative, or predatory behavior bars them from protective custody housing shall be housed in cells in administrative segregation, maximum security, or high security, or cells in another facility.

In determining whether an inmate in protective custody should be housed in a cell, the Department shall continue to apply the criteria set forth in its Institutional Order (6/89) of March 2, 1989. This order shall not be substantially amended or modified without the approval of the court. The Department shall provide a cell within the correctional system to any inmate determined to require protective custody cell housing.

9. Inmates found to require protective custody shall not be commingled in a hous-

ing area with other categories of inmates such as administrative segregation or punitive segregation inmates. Defendants shall provide adequate security to protective custody inmates when they are in common areas of the jail.

## III. CROWDING

10. All inmates housed in dormitories at CIFM shall be afforded a minimum of 60 square feet of floor space in the sleeping area, provided that until completion of the contemplated review commencing six months after the effective date of this decree, the defendants may continue to house inmates at the square footage at which they are presently housed, but in no event shall the population of CIFM exceed 2600.

11. The order in *Benjamin v. Malcolm*, 75 Civ. 3073 (S.D.N.Y. June 23, 1981), limiting the population of CIFM dormitories holding pretrial detainees, shall not be disturbed or modified by this order.

12. No double bunks shall be used in any dormitory at CIFM if they interfere with or obstruct the sight lines from the officer's station in any way.

13. The Department shall continue its present policy of housing no more than one inmate in any cell at CIFM.

14. The receiving room, gymnasium, dayrooms, and any other common areas of CIFM shall not be used to house inmates. An inmate shall be deemed to be housed in the receiving room if he remains there for longer than 24 hours.

## IV. USE OF FORCE POLICY

15. Department of Correction staff shall use force at CIFM only when required to ensure the personal safety of officers or inmates or when necessary to ensure compliance with a lawful order. Department of Correction staff shall not use more force than is reasonably necessary for these purposes. Force shall not be used as punishment by Department of Correction staff or where an alternative to the use of force is reasonably available. Every correctional officer and other Department of Correction staff member shall promptly report in writing any use of force that she or he witnesses or that is reported to her or him by an inmate.

16. The defendants have submitted to the court for its approval written standards and procedures governing the use of force by CIFM staff. The provisions of the plan shall specify, among other items, when force may be used, the nature of minimal force, the nature of alternatives to the use of force, means for avoiding the unnecessary use of force, a continuum of force and the types of force that are generally inappropriate. Pending court approval, the defendants shall observe the standards set forth in the proposed policy.

## V. USE OF FORCE TRAINING

17. The defendants shall continue to provide at least 8 weeks of preservice training to recruits including instruction on interpersonal relations, values and attitudes, conflict resolution and mediation, stress management, human relations, and use of force. The preservice training program shall be designed to communicate effectively to recruits the legal requirements and Departmental policy regarding use of force and to provide them with the skills necessary to follow governing law and policy in the course of their work. The preservice training program shall require that recruits demonstrate proficiency in use of force policy and techniques of unarmed self-defense as a condition of graduation.

18. The Department curriculum materials as to the use of force shall provide guidance to officers as to the appropriate force to use and steps to take to avoid using any force in recurrent situations that officers encounter in their work. The defendants shall furnish plaintiffs' counsel with a copy of the current curriculum materials covering the subjects set out in ¶ 17 within 30 days of the entry of this decree.

19. Defendants shall employ sufficient qualified staff and provide sufficient other resources for the Training Academy attended by CIFM correctional staff to avoid the need to use or require Academy instructors routinely to teach double sessions or routinely to work overtime.

20. Defendants shall employ qualified staff at the Training Academy, in sufficient numbers to meet professionally acceptable student-faculty ratios, to provide competent professional training in accordance with modern educational approaches. Defendants shall employ sufficient qualified self-defense instructors to maintain a student-faculty ratio that shall be specified, in a later order, after further evidence is received identifying the maximum number of students who can be trained effectively in self-defense techniques by a single instructor.

21. The defendants shall create and fill a position of Assistant Deputy Warden ("ADW") at the Academy whose duties shall include management of the use of force instruction program and provision of prepromotional and in-service training in the use of force to captains.

22. The defendants shall continue to provide annually, on average, five days of in-service training to all non-probationary CIFM officers that includes substantial training related to use of force, e.g., interpersonal communications and human relations, non-violent crisis intervention, self-defense, appropriate use of force, and report writing. Probationary officers who have served a year or more shall be required to participate in the use of force section of this program.

23. Commencing July 1, 1989, as part of the annual in-service training program, defendants shall provide semi-annual half-day, mandatory skills retention training in unarmed self-defense for all correction officers assigned to CIFM. Annually, each CIFM officer shall demonstrate proficiency in self-defense techniques.

24. Annually for the next three years, the defendants shall employ a consultant(s) to perform quality assurance checks on the use of force training within the Department. The consultant(s) shall report on the quality of instruction and instructional materials and improvement as necessary. The consultant(s) shall also develop a quality assurance program to maintain the dependability of the program after the three-year period. The plaintiffs' counsel shall have the right to submit its views in writing to the consultant and the consultant shall consider such views in connection with the performance of her or his duties.

25. (a) No officer shall serve on a CIFM probe or response team unless she or he has satisfactorily completed a substantial program of training in emergency response techniques and tactics, including the use and avoidance of force in emergency response situations. (b) No officer who has been disciplined within three years, or against whom disciplinary charges are pending, for misuse of force, for failure to report the use of force, or for falsely reporting the use of force shall serve on the CIFM probe team or response team, unless the Commissioner or a designated deputy determines that in her or his judgment the offense for which the officer was disciplined was not such as to justify his or her exclusion. Should the Commissioner or the designated deputy determine that a CIFM officer shall not be excluded from its response or probe team, she or he shall specify in writing to the court the reasons for the decision.

## VI. INVESTIGATION TRAINING

26. The defendants have submitted to the court for its approval a manual prescribing appropriate investigation techniques and report-writing for use by CIFM personnel performing investigations, as well as a manual identifying the procedures and standards for investigations of alleged uses of force by IAD personnel. These manuals shall emphasize the need to identify all possible witnesses, interview witnesses privately, review medical data, and determine the force used, the reason for and alternatives to its use, and to note and resolve, where possible, factual disputes. Pending court approval, the defendants shall observe the standards set forth in the proposed manuals.

27. All captains or other supervisory personnel assigned to conduct or review use of force investigations at CIFM shall have completed a training course in investigative skills and techniques. All future captains or other supervisory personnel at

CIFM shall receive such training, including familiarity with the requirements of the captains' investigative manual, before they commence their investigative tasks.

28. Within six months of the effective date of this decree, all investigators assigned to the defendants' systemwide unit responsible for investigating uses of force, currently the Investigations and Discipline Division ("IAD") shall have completed a training course in investigative skills and techniques relevant to their duties at CIFM. All future investigators shall receive such training before they begin their duties. On average, all investigators shall annually receive five days of in-service training.

## VII. USE OF FORCE REPORTING AND MONITORING

29. Defendants shall maintain a single reporting and filing system for all uses of force and alleged uses of force at CIFM. All uses of force or alleged uses of force shall be reported by appropriate and competent documentation to the Warden, the Commissioner of the Department of Correction or her or his designee ("Central Office"), and to the Assistant Commissioner for the Investigations and Discipline Unit of the Department ("IAD"). The Warden of CIFM shall personally review all reports of the use of force or the alleged use of force at CIFM. Written procedures governing the new reporting and monitoring system have been submitted to the court for its approval; further modifications related to the computer system shall be submitted by October 1, 1989. Pending court approval, the defendants shall observe the standards set forth in the procedures submitted.

30. Each CIFM staff member who is involved in a use of force or an alleged use of force or who witnesses it or is present at it shall make a full written report of the incident. These reports shall be attached to the use of force form, unusual incident report, or other document that is forwarded to IAD.

## VIII. INVESTIGATIONS

31. All uses of force shall be investigated by supervisory personnel at the institution who have received substantial professional training in investigative techniques and procedures as described above in ¶ 28.

32. IAD shall review all uses of force and alleged uses of force at CIFM and shall evaluate the cases in a manner consistent with the procedures specified in the investigation manual for IAD personnel, including the determination of which cases shall be independently investigated by IAD. Once approved, the category of cases subject to an independent IAD review shall not be modified, except to be expanded, without the approval of the court.

33. Within 30 days after the entry of this order, the defendants shall assign an IAD supervisor exclusively to CIFM to monitor and evaluate CIFM investigations of use of force cases.

## IX. DISCIPLINARY PROSECUTIONS

34. Effective 90 days after entry of this order, defendants shall either resolve or be ready to proceed to trial at the Office of Administrative Trials and Hearings ("OATH"), or another approved disciplinary forum, with all departmental charges for misuse of force or failure properly to report force by CIFM staff, within 90 days of the incident or within 90 days of having first been informed of an alleged use of force or failure properly to report those, except in cases in which:

(a) an outside law enforcement agency is involved and the Department is awaiting notification as to whether that agency intends to proceed with criminal charges or is awaiting resolution of criminal proceedings;

(b) large numbers of inmates and staff are involved or the accused officer(s) has yet to be identified;

(c) the availability of personnel not within the control of the Department (e.g., medical personnel) causes delay in the investigative or trial preparation stages; or

(d) unforeseen, unusual circumstances affect the ability of the Department or the defendant officer to be ready to proceed within 90 days.

Whenever any of these factors prevent the Department from disposing of the case or being ready to proceed at trial at OATH or other appropriate forum, if any, within 90 days, the specific factors causing the delay shall be set forth in the case file. These exceptions shall not relieve the defendants of their obligation to use their best efforts to ensure that they are prepared to resolve or try the case within 90 days of the incident.

No later than 30 days after entry of the decree, the defendants shall commence the process of hiring staff required to meet this goal, both at the investigative and prosecutorial stages.

35. If the trial is delayed pending determination by an outside law enforcement agency whether to proceed with criminal charges, the staff person charged with misuse of force or failure properly to report force shall not, during the pendency of the investigation or prosecution, remain in a position involving inmate contact.

36. In the case of an officer charged with misuse of force or failure properly to report a use of force who is not suspended without pay pending administrative trial, the Commissioner shall give written reasons to the court for such non-suspension unless the Commissioner certifies in writing addressed to the court that to give such reasons would raise questions of executive privilege. Nothing in this order is intended to create a presumption for or against the use of pre-hearing suspension or to affect in any way the Commissioner's decisions concerning suspensions.

## X. STAFFING AND INMATE SUPERVISION

37. At a minimum the defendants shall staff the CIFM dormitories as follows:

a. In each dormitory housing low security inmates, one officer shall be present at all times and the dormitory shall also be continuously toured by a second officer, who may tour two but shall tour no more than two dormitories during a shift. The second officer shall personally observe each inmate during each tour.

b. In each dormitory housing medium security inmates, one officer shall be present at all times. Each such dormitory shall also be staffed by a second officer during evening and midnight tours of duty, who shall continuously tour that dormitory and only that dormitory. During the day shift, the dormitory shall be continuously toured by a second officer, who may tour two but shall tour no more than two dormitories during the shift. The second officer shall personally observe each inmate during each tour.

c. Each dormitory housing inmates in the high, incomplete, mental observation, infirmary, or protective classification shall be staffed by two officers at all times.

d. Each modular dormitory, which includes the two sides of the module, shall be staffed by three officers at all times.

38. There shall be a minimum of two officers on all shifts in any dormitory housing more than seventy inmates, except in those dormitories housing high classification inmates, in which case there shall be a minimum of three officers. Each dormitory shall be staffed by yet another additional officer should the population exceed one hundred; in other words, there shall be three officers in all dormitories housing more than one hundred inmates, except for those dormitories housing more than one hundred inmates classified as high, in which case there shall be four officers. A second, third, or fourth officer assigned to a dormitory shall continuously tour that dormitory and only that dormitory.

39. Defendants shall provide dedicated meal relief officers on all tours to ensure that the above staffing levels are maintained at all times.

40. Whenever an additional officer serves a dormitory, whether it be a second, third, or fourth officer and whether that officer is on a tour of two such dormitories or assigned to one dorm only, that officer shall continually patrol the sleeping area of the dormitory and shall not be removed

from that area to perform administrative or other routine work. Whenever the additional officer must leave her or his post, as, for example, to conduct a search, such departure shall be for a short period only and the officer shall record his or her absence in the dormitory log. During such period, the officer in the officer's station shall maintain constant visual surveillance of the housing area.

41. Each pair of cell corridors shall be staffed with at least two officers at all times and with three officers whenever inmates are permitted to lock out of their cells.

42. One cell area officer shall be stationed inside each cell corridor at all times whenever inmates are allowed out of their cells and shall continually patrol the entire length of the cell corridor, as well as the day room and bathroom, and shall visually inspect the interior of each cell. This officer shall not be removed from the cell corridor to perform administrative or other routine work. Whenever the officer stationed in the corridor must leave her or his post, the remaining officer shall maintain constant visual surveillance of the corridor.

43. The defendants shall maintain a ratio of captains assigned to supervise the housing area officers to housing area officers at the level of approximately 14.7 to 1. An additional captain shall be assigned whenever the ratio exceeds 15.2 to 1.

44. The defendants shall provide sufficient staffing of stair and gate areas to provide for adequate visual surveillance of inmates in these areas. Defendants shall continue to staff these areas as set forth in Exhibits I and J of the Second Koehler Affidavit in Further Support of Defendants' Proposed Order sworn to on May 8, 1989. Defendants shall not substantially modify the staffing provided for in those exhibits without the approval of the court.

## X. MONITORING

45. Defendants shall provide plaintiffs' counsel the following documents on the 15th of every month:

(a) injury to inmate reports created at CIFM during the previous month, along with the injury report log for that month;

(b) the CIFM infraction log for the previous month;

(c) unusual incident reports, use of force reports, and all other reports or investigative summaries concerning violent incidents at CIFM during the previous month;

(d) the "CCC logs" of unusual incidents at CIFM during the previous month;

(e) the security incident log book or other log listing violent incidents at CIFM during the previous month that were not treated as unusual incidents;

46. Defendants shall provide plaintiffs' counsel the following documents on the last day of each month:

(a) documentation concerning CIFM officers created during the previous month pursuant to defendants' Directive 5003;

(b) IAD investigative files concerning use of force incidents at CIFM, including those involving failure properly to report uses of force, closed during the previous month;

(c) memoranda of complaint for misuse of force or failure properly to report force filed against CIFM officers during the previous month;

(d) disciplinary charges for misuse of force or failure properly to report force issued against CIFM officers during the previous month;

(e) dispositions of disciplinary charges for misuse of force or failure properly to report force entered against CIFM officers the previous month;

(f) records of command discipline imposed for misuse of force or failure properly to report force imposed against CIFM officers during the previous month;

(g) a copy of any documents created in the previous month reflecting changes in policy or practice with regard to any of the matters addressed in this order.

47. To facilitate monitoring of defendants' compliance with the terms of this decree:

a. Defendants shall upon request of plaintiffs' counsel supply them with relevant, non-privileged material, not already identified in ¶¶ 45 and 46, concerning implementation, including, but not limited to, records, logs and reports maintained in the institution, and rules, regulations, operating procedures and directives issued by defendants; this provision is adopted without prejudice to plaintiffs moving hereafter for a later order further specifying documents to which plaintiffs' counsel are entitled and without prejudice to defendants' right to object to the production of particular classes of documents.

b. Plaintiffs' counsel shall be permitted to confer confidentially with any individual class member or group of class members, subject to defendants' right to reasonably limit the number of CIFM inmates in any such group and to bar any particular CIFM inmate from participating in such group conferences when, in defendants' judgment, it is required for the security of the institution; nothing in this paragraph is intended to resolve or address the issue of plaintiffs' counsel's right to confer confidentially with groups of the plaintiff class as its legal representative and for purposes other than monitoring compliance;

c. In addition, plaintiffs' counsel and/or experts, upon request, shall have access to any area of CIFM for the purpose of observing compliance with this judgment whenever they have a reasonable belief that such measure is appropriate and that other sources of information are inadequate; provided, however, that such access may be subject to reasonable security and scheduling conditions established by defendants.

48. All documents provided to plaintiffs' counsel pursuant to the previous paragraphs shall be used by plaintiffs' counsel solely for the purposes of monitoring the Department's compliance with this order and shall not be produced by plaintiffs' counsel to any other persons for any other purpose. Nothing in this paragraph shall prevent plaintiffs' counsel from securing such material pursuant to the provisions of the Federal Rules of Civil Procedure for purposes other than securing compliance with this order.

49. Whenever dormitory or cell space is to be added to CIFM, the Department shall, at least 60 days prior to the addition or designation, provide to the plaintiffs' counsel and the court, plans identifying the population to be housed in the addition, the staffing to be provided, the physical configuration and dimensions of the proposed addition, and the number of inmates to be housed in such cells and dormitories. The terms of the decree shall apply to any housing added to CIFM.

## XI. ENFORCEMENT

50. If a dispute arises as to whether defendants are in compliance with any of the terms of this order, the parties shall make a good faith effort to resolve their differences. Before instituting any proceeding before the court to enforce the order, plaintiffs' counsel shall notify defendants' counsel and counsel for the Department of Correction of any claim that defendants are in violation of any term of the order. Within five days of the receipt of said notice, counsel for the parties shall meet and try to resolve the claim amicably. Failing such resolution, plaintiffs may then have due recourse to the court.

51. Where plaintiffs' counsel asserts a claim that involves a threat to the immediate physical or mental well-being of any member of the plaintiff class, plaintiffs shall have due recourse to the court within 24 hours of notification to defendants' counsel of such claim.

**APPENDIX A**

THE CITY OF NEW YORK
DEPARTMENT OF CORRECTION

**ARRAIGNMENT IDENTIFICATION AND
INITIAL CLASSIFICATION SCREENING**

AFFIX INMATE'S LABEL OR COMPLETE
SECTION # 1

BOOK & CASE #: _____

N.Y.S.I.D. #: _____

**SECTION #1**

Inmate's Name: _____

Address: _____ Zip Code: _____

Date of Birth: _____ Race:_____ Sex: _____ Height: _____ Weight: _____ Eyes: _____ Hair: _____

Nativity: _____ Citizenship: _____ Education: _____ Occupation: _____ Veteran: _____

Drug Abuser? (Yes) (No) If yes specify: _____ Religion: _____

Who Shall we notify in case of emergency: _____

Address: _____ Zip Code: _____

Phone Number: ( ) _____ Relationship: _____

xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

**SECTION #2**

Social Security #: _____ Marital Status: _____ Alcohol Abuser? (Yes) (No)

Have you ever been arrested before? (Yes) (No) A.K.A.'s: _____

Immediate Medication Needs: (Yes) (No) If yes specify: _____

Physical condition (as stated by inmate): _____

Officer's Observations: _____

Description of clothing: _____

Warrants, Detainers, Holds, etc.: (Yes) (No) Type and Location of Hold: _____

Signature of arresting officer: _____ Pct.: _____ Shield: _____

Date of arrest: _____ Processed by: _____ Shield: _____

Date: _____ Time: _____ Facility: _____

Inmate's signature upon admission to court facility: _____

Inmate's signature if discharged from court facility: _____

Ask each inmate questions 1–5. Review all accompanying documents, then answer questions 6–8. If there is a conflict between the inmate's response and the accompanying documents, check the box marked "Conflict" as well as the inmate's answer.

| | YES | NO | CONFLICT |
|---|---|---|---|
| 1. Do you know of any reason why you cannot be housed in general population? If yes, indicate reason: _____ | ☐ | ☐ | ☐ |
| 2. Have you ever been or are you now a police informant? | ☐ | ☐ | ☐ |
| 3. Have you ever been or are you now a law enforcement agent? If yes: Agency: _____ When: _____ | ☐ | ☐ | ☐ |
| 4. Have you ever been convicted of: Escape ( ), Absconding ( ), or A.W.O.L. ( ). If yes: When _____ Where: _____ | ☐ | ☐ | ☐ |
| 5. If you are a Homosexual, Transvestite or Transexual, do you wish to be housed in separate Homosexual housing? | ☐ | ☐ | |
| 6. Is protective custody or suicide watch indicated on the commitment papers? If yes, ascertain reason from court personnel, indicate authority: _____ | ☐ | ☐ | |

7. Circle any of the below listed charges which appear on the commitment papers:

105.17 125.25 130.50 135.25 205.10 205.17 215.56 240.06 125.27 263.10
120.11 130.35 135.20 205.05 205.15 215.13 215.57 263.05 200.04 263.15

| | YES | NO |
|---|---|---|
| If the inmate is charged with one of the above, is there any reason which warrants consideration for placement into special housing? If yes: Specify _____ | ☐ | ☐ |
| 8. Does any other correspondence/documents accompanying the inmate indicate the need for special housing. If yes: Specify _____ | ☐ | ☐ |

Prepared by: _____ Shield _____ Inmate's signature _____

| | 7 | 5 | 3 | 1 | | |

| 2. | SEVERITY OF WARRANTS, DETAINERS OR HOLDS: |
| | GREATEST | HIGH | MODERATE | LOW |
| | 7 | 5 | 3 | 1 |

| 3. | HISTORY OF PRIOR CONVICTIONS: |
| | FELONIES | MISDEMEANORS | VIOLATIONS | NONE |
| | 5 | 3 | 1 | 0 |

| 4. | HISTORY OF ESCAPE: |
| | | WITHIN 5 YEARS | PRIOR TO 5 YEARS | NONE |
| | SERIOUS– | 7 | 5 | 0 |
| | MINOR– | 4 | 3 | 0 |

| 5. | HISTORY OF VIOLENCE: |
| | | WITHIN 5 YEARS | PRIOR TO 5 YEARS | NONE |
| | SERIOUS– | 7 | 5 | 0 |
| | MINOR– | 4 | 3 | 0 |

COMPLETE FOR ALL STATE INMATES: (CIRCLE ONE) TO BE OBTAINED
FROM THE ACCOMPANYING CUSTODIAL TRANSFER FORM.
MAXIMUM–A MEDIUM–A
MAXIMUM–B MEDIUM–B MINIMUM TOTAL SCORE:

## SECTION II, RECEIVING ROOM CAPTAIN

Free Telephone Call: (Yes) (No) Date: _____ Time: _____ Telephone # Called: _____

REVIEW ALL ACCOMPANYING DOCUMENTS AND COMPLETE: YES NO

1. Is protective custody, suicide watch or an indication of psychiatric commitment ☐ ☐
 indicated on the commitment papers?

2. Has the medical staff cleared the inmate for general population? ☐ ☐

3. Does this inmate require special housing? if yes, indicate reason(s):_____ ☐ ☐
 _____

4. Is the housing designation you have assigned against the inmate's will? ☐ ☐
 If yes, inmate is to be given a notice of right to due process hearing form.

_____ _____ _____ _____
Receiving Room Captain's Signature Shield Date Time

_____
Inmate's Signature

FINGERPRINTS——LEFT INDEX FINGER ONLY

| FIRST ADMISSION | DISCHARGE FROM COURT PEN |