Jerry JENSEN, et al., Plaintiffs,

v.

Frank GUNTER, et al., Defendants.

Reginald PIERCE, et al., Plaintiffs,

v.

Harold CLARKE, et al., Defendants.

Mohamed Abdul Hafiz El
TABECH, Plaintiffs,

v.

Frank GUNTER, et al., Defendants.

Victor LUNA, et al., Plaintiffs,

v.

Harold CLARKE, et al., Defendants.

Nos. CV 87–L–607, CV 87–L–497, CV
87–L–377 and CV 87–L–476.

United States District Court,
D. Nebraska.

Sept. 9, 1992.

Jerry Jensen, pro se.

Scott D. Freese, Hutton, Freese Law Firm, Norfolk, NE, for plaintiff Jerry Jensen.

Terri M. Weeks, Atty. Gen., Lincoln, NE, for defendants.

Reginald Pierce, pro se.

Richard Duff, pro se.

Harold Crisp, pro se.

Ernest L. Sims, pro se.

Mohamed Abdul Hafiz El–Tabech, pro se.

Robert W. Shively, Jr., Demars, Gordon Law Firm, Lincoln, NE, for plaintiff Mohamed Abdul Hafiz El–Tabech.

Laddie Dittrich, pro se.

Victor Carter, pro se.

George Carter, pro se.

Victor Luna, pro se.

Barry L. Hemmerling, Jeffrey, Hahn Law Firm, Lincoln, NE, for Victor Luna.

Gregory D. Barton, Harding Ogborn Law Firm, Lincoln, NE, for plaintiffs Reginald Pierce, Richard Duff, Al Wilson, Ernest L. Sims, Harold Crisp, Laddie Dittrich, Gus Dawson, Victor Carter, George Carter and Michael Kane.

## MEMORANDUM OPINION AND ORDER

CAMBRIDGE, District Judge.

This matter is before the Court on the report and recommendation of Magistrate Judge David L. Piester, (CV 87–L–607, Filing No. 186; CV 87–L–497, Filing No. 179; CV 87–L–377, Filing No. 166; CV 87–L–476, Filing No. 180), the Plaintiffs' objections thereto, (CV 87–L–607, Filing No. 190; CV 87–L–497, Filing No. 184; CV 87–L–377, Filing No. 170; CV 87–L–476, Filing No. 185), and the Defendants' objections thereto, (CV 87–L–607, Filing No. 191; CV 87–L–497, Filing No. 185; CV 87–L–377, Filing No. 171; CV 87–L–476, Filing No. 186).

The Court has reviewed the report and recommendation pursuant to 28 U.S.C. § 636(b)(1) and Local Rule of Practice 49(B) and finds that the report and recommendation should be adopted.

## I. FACTUAL BACKGROUND

These civil rights actions were brought under 42 U.S.C. § 1983 by a plaintiff class consisting of all inmates housed or to be housed in the four main housing units of the Nebraska State Penitentiary. The issues are related to two constitutional provisions. The Plaintiffs' main claim is that the practice of double-celling violates the Eighth Amendment cruel and unusual punishment clause, a claim that rests on challenges to numerous particular conditions of the Plaintiffs' confinement within double cells. The Plaintiffs' other claim is that the penitentiary's policy relating to inmate liability for contraband found in a double cell violates the Fourteenth Amendment due process clause. Judge Piester, following an eighteen-day evidentiary hearing, thoroughly analyzed all issues and concluded that the Plaintiffs met their burden of proof only as to the following claim: the Plaintiffs' entitlement to injunctive relief premised on the failure of the Defendants to safeguard the Plaintiffs from the threat of violent attacks by a cellmate. Judge Piester recommends that the Defendants be granted a period of time to submit a remedial plan to correct this deficiency.

Both the Plaintiffs and Defendants have objected to portions of the report and recommendation. The Plaintiffs raised two objections. First, the Plaintiffs object to Judge Piester's conclusion that an Eighth Amendment violation exists only as to the placement of newly arriving inmates on the basis that the conclusion is too narrow. Second, the Plaintiffs object to Judge Piester's finding that the Defendants are entitled to qualified immunity. The Defendants objected to the report and recommendation on a total of twenty-six grounds.[1]

## II. DISCUSSION

Judge Piester recommends that: the Court enter judgment in favor of the Plaintiffs as to their claim for injunctive relief premised on the failure of the Defendants Hopkins and Clarke, in their official capacities, to safeguard the Plaintiffs from the threat of violent attacks by a cellmate, and in favor of the Defendants on all other claims; the Defendants be granted a period of time in which to submit a remedial plan to correct the deficiency set forth herein; and that this Court hold any and all further proceedings necessary to ensure that injunctive relief is promptly implemented.

The Court emphasizes that it has very thoroughly analyzed all objections to Judge Piester's report and recommendation as well as the briefs submitted with regard to such objections, reviewed in its entirety the transcript of the eighteen-day proceeding held in this matter, and reviewed the exhibits admitted into evidence at the proceeding. After meticulous consideration, the Court finds that the report and recommendation should be adopted in its entirety.

IT IS ORDERED:

1. The report and recommendation, (CV 87–L–607, Filing No. 186; CV 87–L–497, Filing No. 179; CV 87–L–377, Filing No. 166; CV 87–L–476, Filing No. 180), is adopted;

2. The Plaintiffs' objections, (CV 87–L–607, Filing No. 190; CV 87–L–497, Filing No. 184; CV 87–L–377, Filing No. 170; CV 87–L–476, Filing No. 185), and the Defendants' objections, (CV 87–L–607, Filing No. 191; CV 87–L–497, Filing No. 185; CV 87–L–377, Filing No. 171; CV 87–L–476, Filing No. 186), are overruled;

3. Judgment is hereby entered in favor of the Plaintiffs as to their claim for injunctive relief premised on the failure of the Defendants Hopkins and Clarke, in their official capacities, to safeguard the Plaintiffs from the threat of violent attacks by a cellmate, and in favor of the Defendants on all other claims;

4. The Defendants are hereby granted ninety (90) days from the date of this order in which to file with this Court a remedial plan to correct the deficiency set forth herein and more completely in the report and recommendation; and

5. This Court shall hold any and all further proceedings necessary to ensure that injunctive relief is promptly implemented.

---

1. Although it appears that the Defendants have raised twenty-seven objections, as they have misnumbered the objections the correct total is twenty-six.

## JUDGMENT

In accordance with the memorandum opinion and order entered on this date,

IT IS ORDERED:

1. The report and recommendation, (CV 87–L–607, Filing No. 186; CV 87–L–497, Filing No. 179; CV 87–L–377, Filing No. 166; CV 87–L–476, Filing No. 180), is adopted;

2. The Plaintiffs' objections, (CV 87–L–607, Filing No. 190; CV 87–L–497, Filing No. 184; CV 87–L–377, Filing No. 170; CV 87–L–476, Filing No. 185), and the Defendants' objections, (CV 87–L–607, Filing No. 191; CV 87–L–497, Filing No. 185; CV 87–L–377, Filing No. 171; CV 87–L–476, Filing No. 186), are overruled;

3. Judgment is hereby entered in favor of the Plaintiffs as to their claim for injunctive relief premised on the failure of the Defendants Hopkins and Clarke, in their official capacities, to safeguard the Plaintiffs from the threat of violent attacks by a cellmate, and in favor of the Defendants on all other claims;

4. The Defendants are hereby granted ninety (90) days from the date of this order in which to file with this Court a remedial plan to correct the deficiency set forth herein and more completely in the report and recommendation; and

5. This Court shall hold any and all further proceedings necessary to ensure that injunctive relief is promptly implemented.

## REPORT AND RECOMMENDATION

PIESTER, United States Magistrate Judge.

This civil rights action, brought under 42 U.S.C. § 1983, came on for an evidentiary hearing for an eighteen-day period between August 16, 1991 and September 22, 1991.[1] The plaintiff class consists of all inmates housed or to be housed in the four main housing units of the Nebraska State Penitentiary. They assert an entitlement to damages and injunctive relief against defendants, officials of the Nebraska Department of Correctional Services and the Nebraska State Penitentiary.

The disputed issues revolve around two constitutional provisions. Plaintiffs' main protestation is that the practice of placing two men per cell (double celling) in cells designed to house only one man in the penitentiary's four main housing units violates the Cruel and Unusual Punishment Clause of the Eighth Amendment. This claim is structured upon challenges to a number of particular conditions of plaintiffs' confinement within those double cells. Plaintiffs also contend that the penitentiary's policy relating to inmate liability for contraband found within a double cell violates the Due Process Clause of the Fourteenth Amendment. Upon consideration of the evidence and arguments presented, I conclude that plaintiffs' have met their burden of proof as to only one claim: their entitlement to injunctive relief premised on the failure of defendants to safeguard plaintiffs from the threat of violent attacks by a cellmate.

## I.

### BACKGROUND

The existing penitentiary was opened in December of 1981. There are six housing units within its parameters; however, the constitutionality of the conditions of confinement within the Adjustment Center (Housing Unit 5) and the Medium Security Unit (Housing Unit 6) are not at issue in this proceeding. As noted, this controversy centers on the four main housing units at the penitentiary (Housing Units 1 through 4). Confined within Housing Units 1 through 3 are general population inmates. Housing Unit 4 contains general population inmates, protective custody inmates, and inmates who have been sentenced to death.

Each of the four main housing units was designed and constructed to contain eighty single cells (a cell occupied by one inmate). Vol. VII at 1134:8–13, VIII at 1495:10–25,

---

1. The issues in this case were many and complex; their analysis and presentation required a nearly Herculean effort from counsel. I commend counsel for rising to the difficult challenges faced in bringing this case to a reviewable posture.

1518:2–8. The size of the cells are consistent with a single-cell design—the blueprints reveal that each cell contains approximately seventy-four square feet.[2] Exhibit 1(I). In a single cell, floor space is encumbered by a bed, a toilet/sink combination, a table, chair, a footlocker (which can be placed underneath the bed), the inmate and his belongings. Vol. II at 169:21–170:2, Vol. III at 388:8–391:2. In a double cell additional floor space is taken up by another man and his belongings, an additional chair and footlocker, and, (if the beds are not stacked in a bunk arrangement), an additional bed. Vol. III at 391:22–392:13.

Although designed and built to house eighty inmates, there has never been a time when that number has not been exceeded in every one of the four main housing units. Exhibit 321. The fact of overcrowding[3] has been consistent and the increase in inmate population has been dramatic.[4] Exhibit 106 reveals that on September 6, 1991 the four main housing units (designed to house a total of 320 inmates) were housing 528 inmates, which is sixty-five percent above capacity. Defendant Clarke, Director of the Department of Correctional Services, observed that the four main housing units are "bursting at their seams." Vol. VIII at 1406:1–3. He also testified that the inmate population is growing and it is expected that the population will continue to grow.[5] Vol. VII at 1250:3–8.

In order to accommodate the overcrowding, a double-celling practice has been implemented in the four main housing units. The practice has consisted of setting aside a certain number of cells in each unit as double cells. The number of cells set aside per housing unit for double celling has increased during the course of the decade from fifty to fifty-five to the present number of sixty. Vol. VII at 1190:21–23, Vol. XVIII at 3635:13–3636:8. The increase in double celling has been necessary to create

---

**2.** There was a great deal of discussion about the effects of the diminutive size of the cells. Witnesses who have been housed in a double-cell arrangement spoke convincingly about the limitations and detrimental effects of such a small amount of space which two persons must be share. Under the standards set forth by the American Correctional Association (ACA), exhibit 21, the double cells are *too small to adequately provide for the humane treatment of incarcerated persons.* Vol. XI at 2195:21–2196:20. One of the defendants opined that the size of the cells was "adequate." Vol. XIV at 2735:9–14. Defendants' expert, James Murphy, testified only that "[t]here was still room to move around." Vol. XVI at 3045:4–12. In spite of serious reservations about whether the cell size as a condition of confinement by itself could survive an Eighth Amendment challenge, I make no such finding or recommendation. *See Cody v. Hillard,* 830 F.2d 912, 919 (8th Cir.1987) (en banc) (CJ Lay dissenting) (courts should decline to rule on constitutional issues unless it is necessary), *cert. denied,* 485 U.S. 906, 108 S.Ct. 1078, 99 L.Ed.2d 237 (1988). The size of the plaintiffs' cells is not a condition which, itself, is challenged in this suit. This is made clear by its absence from the pretrial order. To the extent this condition affects challenged conditions such as the lack of privacy and the level of violence in the penitentiary, the factor of cell size will, however, be considered.

**3.** I use this term to refer to the fact that the number of inmates exceeds the design capacity of the facilities; it does not imply any judgment about that fact.

**4.** Noting that population summaries contained in Exhibit 321 from December of 1981 through July of 1991 fail to provide totals for eight months, I calculate the yearly averages as follows:

| Year | Average Total Population In Housing Units 1–4 | Average Over Design Capacity |
|------|----------------------------------------------|------------------------------|
| 1981 | 452 | 41 percent |
| 1982 | 476 | 49 percent |
| 1983 | 482.6 | 51 percent |
| 1984 | 484 | 51 percent |
| 1985 | 474.7 | 48 percent |
| 1986 | 476.9 | 49 percent |
| 1987 | 496.1 | 55 percent |
| 1988 | 461.6 | 44 percent |
| 1989 | 494.4 | 55 percent |
| 1990 | 513.5 | 60 percent |
| 1991 | 523.4 | 64 percent |

**5.** This brings up an important factor to be considered regarding the class status of the plaintiffs. Presently the plaintiff class consists "of all current and future prisoners who are or who in the future may be required to be confined in a single cell with another prisoner in any of the four main housing units at the Nebraska State Penitentiary." Filing 36 of CV87–L–607. In light of changing conditions accompanying the increase in inmate population, it is difficult to foresee how any judgment in this case could serve as a collateral bar to future consideration of the conditions of double celling in the four main housing units.

additional bed space. Exhibit 3 at p. 3; Vol. VII at 1192:6–8. Although there is no written policy dictating which inmates are assigned to the remaining single cells, the practice at the penitentiary is to have a waiting list in each of the housing units. Vol. I at 48:1–4. When an inmate's name rises to the top of the list, he is entitled to the next vacant single cell; however, it takes years to get to the top of such lists. Vol. II at 176:14–21 (after three years inmate Bradley has moved from eighteenth to twelfth on the list), Vol. III at 458:24–455:1 (inmate Crisp waited four or five years before receiving a single cell).

Before making findings of fact on the challenged conditions and issues, it is important to focus once more on the nature of one of the disputed issues. The Eighth Amendment issue in this case relates only to the practice of double celling. This case is not an overcrowding case in the sense that plaintiffs are asserting that the penitentiary houses more inmates then it can adequately manage or provide human services for. Nor is this a case which challenges the constitutionality of an expansive list of individual prison conditions. To the extent that I discuss certain prison conditions, my findings will be limited to whether any of these conditions demonstrates that the practice of double celling is unconstitutional, not whether any particular condition, standing alone, would survive a constitutional attack.

## II.

## FINDINGS OF FACT

### (A)

### NOISE

The noise level, as Judge Urbom found on the motion for preliminary injunction, filing 78 of CV87–L–377, is considerable. The cement and steel construction of the housing units does little to muffle what was characterized as a dinning irritant that lasts into the night. Vol. I at 72:3–73:18. The main causes are the operating of the cell doors, the speaker system, day rooms, showers, and the inmates themselves. Vol. I at 38:4–11, 39:1–21, 72:3–73:18, Vol. II at 315:23–316:10, Vol. III at 402:14–17, 541:5–20. In respect to the operation of the doors, the noise problem is greatest during the "running of the doors." Each day, for a ten-minute stretch of time every hour, except during lockdowns, inmates are permitted to leave or enter their cells. Vol. II at 261:20. In order to have one's cell door unlocked, an inmate must yell out his cell number. When groups of inmates are yelling at the same time the sound is particularly deafening. Vol. I at 38:4–11, 39:1–21, Vol. III at 479:25–480:1.

In response to the excessive noise problem, defendants have implemented a noise policy. That policy prohibits free-standing speakers; radios must be listened to only through headphones; and the volume of televisions must be kept to a reasonable level. Exhibits 18, 62, 282; Vol. I at 74:1–8, Vol. V. at 753:25–757:9, Vol. XII at 2241:11–2242:25, Vol. XIII at 2574:6–2575:4. This policy is not always strictly enforced, but has helped reduce the noise from the electronic equipment. Even when the noise policy is strictly enforced, the other sources of sound still make the housing units a considerably loud place to live. Although plaintiffs have shown that the housing units are loud, they have not shown that excessive noise has caused any serious effects upon their physical or mental well being. The excessive noise does, however, contribute to the level of tension in the units.

### (B)

### VENTILATION

Plaintiffs contend that the ventilation system in the four-main housing is inadequate because it causes problems with dust, odor, contagious disease, medical problems, breathing problems, and eye problems. The evidence did not bear this out. The plaintiffs' testimony indicates only that they had to dust their cells sometimes twice a day. I do not credit the conclusory statements of some of the plaintiffs which attempted to attribute to the ventilation system a host of maladies, including the passing of cigarette smoke and other odors from cell to cell. There was no credible evidence indicating that the venti-

lation system has any adverse impact on plaintiffs' health.

The only connection between this challenged condition and the practice of double celling relates to the welding shut of the window of each cell. Exhibit 56, Vol. I at 30:6–13. For a period of time each inmate could open a small portion of an outside window. Exhibit 276(v). By ordering those welded shut, prison officials have limited a means for individuals to assert some control over the environment in which they spend a majority of every day and also prevented inmates from using the windows as a means of dissipating cigarette smoke and other odors. These limits have increased the tension levels in the four main housing units.

### (C)

### CORRECTIONAL STAFF

Plaintiffs assert that the level of correctional staffing is inadequate to meet the needs of a growing population in the four main housing units. While it may be true that overcrowding has grown to a crisis proportion, there is no evidence that prison officials at the departmental and penitentiary level have failed to adequately respond to the increased demands on staff. There was no showing that an increase in correctional staff is necessary to continue to maintain security and order as well as the humane treatment of the inmates within the four main housing units. I decline to speculate as to how long prison officials can maintain a prison within the bounds of decency at present or reduced staffing levels. Plaintiffs bore the burden of proving the finite nature of such a circumstance, but the proof in that regard was lacking. For other reasons to be stated, I conclude that the double-celling practice in the four main housing units is unsafe. The number of correctional staff, however, is not a significant factor in that determination.

### (D)

### INTERCOM SYSTEM

Each of the four main housing units is shaped like a letter X. In the center are two control centers, and each control center monitors two wings. Exhibit 287. The wings are two-tiered and contain twenty cells apiece, ten on each floor. One cannot see into any of the cells from the control center. Exhibits 6(b) and (c), 276(m)(n)(o); Vol. VII at 1136:19–22, Vol. X at 1813:2–3. In fact, because the cell doors are solid and contain only a small window about eye level and a small vent, one cannot see into a cell unless that person is standing very near or directly in front of the cell door. The result is that there is no visual surveillance of inmates while they are in their cells except upon the occasions when a correctional officer is in the hallway looking into cells. This leaves inmates unsupervised, at least visually, for extended periods of time. Vol. X at 1857:15–18.

The lack of visual surveillance has created a need to use an intercom system. In the hallways and day rooms of each housing unit are a set of speakers and receivers which connect with the control centers. There are no intercoms in any of the cells, nor is there any other means for inmates within a cell to notify an officer in the control center of a need for assistance other than yelling through the door vent into the hallway. The control center officers can control the volume of the intercom system and even shut it off entirely.

Plaintiffs asserted that when they yell into the hallway for assistance they are often not heard by the control center officers. Defendants maintained that if an inmate requested assistance from his cell he could be heard, and that inmate assaults upon other inmates in cells could be detected by the intercom system.

Surveillance of inmate activity through the intercom system is an acute problem during the running of the doors, and it is during this time that inmates are most at risk of being attacked without sufficient means of contacting staff. Exhibit 60, 67, 68; Vol. III at 537:5–538:4, Vol. IV at 553:21–554:1, 558:15–559:4. However, there was no evidence that any undetected violent attack occurred during these times. The fact that inmates have to be patient and wait to be heard during the running of the doors is no more than a minor annoyance and has no negative reflection on the

practice of double celling. Any problems with control center officers turning down or off the intercom system are an unfortunate but infrequent occurrence. Exhibit 107; Vol. II at 174:10–17.

The intercom system is of limited value in the detection of violent altercations between cellmates in cells, and it is highly probable that such an altercation will not be detected. *See e.g.* attack on Jensen by cellmate, Vol. IV at 613:1–5 (Jensen unavailingly yelled for help just three feet from his door while being attacked) and attack upon Harpster by his cellmate, Vol. VI at 1060–1074 (sound of Harpster's head being pummelled into a table by cellmate undetected by the intercom system). The deficiencies in the surveillance of the inmates while they are in their cells is a problem of serious magnitude.

### (E)

### ASSAULTS BETWEEN CELLMATES AND VIOLENCE GENERALLY

The penitentiary is considered a maximum security institution and its function within the state's correctional system is to house multiple and violent offenders. Vol. VIII at 1291:16–22. Approximately fifty-seven percent of the inmates at the penitentiary are multiple offenders and forty-two percent are first time offenders. Vol. VII at 1170:224. As a description of the function of the penitentiary, defendant Clarke made the following observations:

> The Nebraska State Penitentiary is the maximum unit. We refer to it as the last stop in the system. You can't go beyond that. Most of the difficult-to-manage offenders are sent to the state penitentiary.... The penitentiary by design is to house offenders twenty-six years and older. However, we do have some individuals that are younger than twenty-six housed at the penitentiary, and ... those assignments resulted either from the type of crime that was committed by that person, which requires or necessitated placement in the penitentiary, or the transfer to the penitentiary from another

institution as a result of that person's behavior at that facility.

Vol. VII at 1274:21–1275:15.

There is no dispute that prisons by their nature can be expected to have some violent confrontations between inmates and between inmates and staff. Noting that inmates are confined against their will, defendant Clarke instructs that the reasons fights and assaults occur relates to

> the nature of the individuals, the demeanor of the individuals that are incarcerated. We have repeat offenders. We have rapists, we have murderers, other offenders who are housed in the department. It's only reasonable to expect that if they could not abide by the norms and laws in a free society that the same will continue to some degree while they're incarcerated.

Vol. VIII at 1455:4–1456:5.

The Department of Correctional Services' Adult Inmate Classification Manual adds further illumination as to the type of persons in the prison system:

> Many inmates come into the institution with a high need for ascendancy and power. This attribute tends to increase the likelihood of physical aggression toward other inmates, and a history of this type of behavior is also predictive of future acting out. Having come from a community environment which is oriented toward physical confrontation as way of maintaining self-esteem, and having a need to develop a macho self-concept both contribute greatly to the incidents [sic] of violence toward other inmates.

Exhibit 328 at 15, § 2. As a consequence, the four main housing units contain potentially dangerous persons who are prone to acting out violently.

Arlene Trainor, the Associate Director of Nursing at the penitentiary and a witness for the defendants, testified that she sees approximately four inmates a year that have been involved in assaults with other inmates that have resulted in injuries requiring treatment in an outside hospital for either a broken bone, stitches, or a loss of consciousness. Vol. XI at 2100:4–25. For inmate/inmate assaults that result in less

serious injuries requiring medical treatment, such as contusions, bruises, swelling, abrasions, etc., she sees approximately two or three inmates a week. Vol. XI at 2101:10–16. On a yearly basis she sees about six cases where the cause of injury is suspected to be an assault but the patient offers a different explanation. Vol. XI at 2102:3–23.

Sexual assaults have occurred in the four main housing units, but defendant Clarke testified that their frequency is not great. Vol. VII at 1166:20–1167:1, VIII at 1317:12–13. No more than two or three a year are reported. Vol. VIII at 1388:18–21. However, defendant Clarke concedes that a greater number than that are not reported, and that fear of reporting could increase any hesitation to report, especially if a victim must report on an assault by a cellmate. Vol. VIII at 1420:16–17, 1421:5–8.

A review of Exhibits 19, 27, 32, 33, 34, 36, 39, 75, 76, 77, 81, 84, 85, 86, 87, 88, 89, 90, 91, 92, 103, and 291 through 299 unearths a grim picture of a growing problem with violence at the penitentiary. I also note that the number of inmates requesting to be placed into protective custody because they feared for their personal safety has increased dramatically in recent years (one hundred percent). Vol. VIII at 1391:24–25. Exhibits 291 through 299, a compilation of monthly reports which includes statistics on the number of inmates found guilty by a disciplinary committee of such violent offenses as assaults, aggravated assaults, fights and threats of bodily harm shows the following:

1. In 1983 there were 77 findings of guilt for assaults and fights;

2. In 1984 there were 81 findings of guilt for assaults and fights;

3. In 1985 there were 182 findings of guilt for assaults and incidents of threatened bodily harm;

4. In 1986 there were 205 findings of guilt for assaults and incidents of threatened bodily harm;

5. In 1987 there were 359 findings of guilt for assaults and incidents of threatened bodily harm;

6. In 1988 for the ten-month period recorded there were 167 findings of guilt for assaults and incidents of threatened bodily harm;

7. In 1989 for the eleven-month period recorded there were 235 findings of guilt for assaults and incidents of threatened bodily harm;

8. In 1990 there were 289 findings of guilt for assaults and incidents of threatened bodily harm; and

9. In 1991, through June, there were 179 findings of guilt for assaults and incidents of threatened bodily harm.

The above records of observed instances of violence do not fully reflect the level of violence in the penitentiary, primarily for three reasons.

First, there is a reluctance among inmates to inform prison officials of the misconduct of another inmate. This is termed "snitching," and is frowned upon severely by other inmates. Vol. I at 78:10–20, 79:1–4. I do not credit the testimony of defendants' witnesses which attempted to assert that most inmates actually act in their own best interest by snitching and therefore are motivated to do so, and do so routinely. *See e.g.* Vol. XVI at 3071–72.

Second, if an inmate involved in a violent altercation with another inmate reports the incident to prison officials and there is evidence to corroborate the fact that an altercation has occurred, it is undisputed that both the reporting inmate and the accused inmate will receive misconduct reports and be forced to go through disciplinary proceedings and perhaps even segregation. That is an institutional policy. Without comment as to whether such a policy is an effective tool of prison management, I find the policy is a substantial deterrent to reporting violent altercations.

Third, if there is no evidence to substantiate that a violent altercation has occurred, such as witnesses or visible injuries, prison officials do not issue a misconduct report to any of the inmates alleged to be involved. This is because there is an institutional policy which requires corroboration by prison staff of misconduct before a misconduct report is issued. For those incidents where corroboration is lacking, this policy is also a deterrent to reporting.

Even taking into consideration that during the early 1980s there was less emphasis on the reporting of misconduct, the figures in exhibits 291 through 299 have a positive correlation with the rate of overcrowding as evidenced in the figures in footnote 4. I find, therefore, that overcrowding has increased the amount of violence in the four main housing units. I also note that the same overcrowding has caused a corresponding need to increase double celling. Exhibit 3 at p. 3; Vol. VII at 1192:6–8. These facts lead me to conclude that there is also a positive correlation between the amount of double celling and the increase of violent incidents in the four main housing units. However, there is no evidence to substantiate the proposition that placing two men in a cell is the cause of the increase of violence institution wide.

Not only is the penitentiary a violent place institution wide, there was also evidence that a problem with violence exists within the double cells. Plaintiffs' evidence in this respect was not premised upon a parade of statistics but on anecdotal testimony recounting the tension and violence that comes to bear when two inmates are placed together in a double cell in one of the four main housing units. The testimony of two plaintiffs stands out.

Inmate Jensen was transferred to a double cell in one of the four main housing units from what was then the minimum-security unit or T–Dorm. Vol. IV at 598:4–25. At the time he was twenty-one years old, about five feet ten inches in height, weighing a hundred and forty-five pounds, and was incarcerated for a theft offense. Vol. IV. at 598:4–25, 612:3–10. His cellmate was inmate Svitak. Vol. IV at 600:10–23. Svitak, is a tall, musclebound, "older" (about 45) man who weighed roughly two hundred and fifty pounds, and who is serving a life sentence. Exhibit 22; Vol. IV at 605:6–24. Svitak had previously displayed his violent temperament by assaulting a staff member and he had made staff clearly aware that he did not want any cellmates. Vol. XIII at 2661:17–23.

Jensen and Svitak met for the first time on September 27, 1987 at the lockdown which precedes the evening meal, and Svitak told Jensen that he did not want a cellmate and that Jensen should try to move out. Jensen told Svitak that he had already requested to be celled with his brother (who was confined in another of the four main housing units). Vol. IV at 604:15–605:14, 606:9–10. The next day Svitak reminded Jensen in a serious manner that Jensen needed to move out. Vol. IV at 606:14–20. Jensen then sent a written request to defendant Beaver asking to be moved. Vol. IV at 607:7–17.

Before breakfast on September 30, Jensen was awakened by Svitak punching him in the face. Vol. IV at 610:6–15. The cell door was closed and locked as it always is during periods of lockdowns. Vol. IV. at 610:19–22. Jensen spun around and began to scream for help. Vol. IV at 611:4–5. All the while Svitak was yelling at him, telling Jensen to get his belongings and get out. Vol. IV at 611:12–14. When yelling, Jensen was on his bunk and just three feet from the cell door. Vol. IV at 613:1–5. He estimated the incident lasted ten to fifteen minutes. Vol. IV at 612:14–15. No help arrived. Vol. IV at 612:22–23, 613:19–614:3. When the door was unlocked, Svitak left for breakfast and Jensen packed up his belongings. Vol. IV at 614:6–9. At Jensen's insistence he was moved to a different cell. Vol. IV at 619:10–15. In spite of frequent requests to cell with his brother, the request was never granted. Vol. IV at 620:12–13. Jensen reported the assault, but prison officials took no action. There was no corroborating evidence. Vol. IV at 621:6–11, 622:10–12, Vol. XIII at 2481:14–19.

The second testimony from a plaintiff which I characterize as remarkable is that of inmate Hart, a former inmate of the Oregon State Department of Corrections who was confined there following his convictions for attempted murder and assault. Vol. V. at 835:20–836:2, 867:5–7. Hart is an aggressive, loathsome individual, who with complete indifference recounted the circumstances that led to his transfer to Nebraska. He states that he used a single edged razor to do the following to his Oregon cellmate: "slit his throat" and "slice [him] from the right shoulder down to the stomach area and across to the left side of

the belly and up from his ass all the way back—from his spine all the way through the back of head." He "then picked up a ball-peen hammer and began to use it on [the cellmate]." When he thought the cellmate was dead, he walked away. Vol. V at 837:10–21.

Hart first arrived at the Diagnostic and Evaluation Center of the Lincoln Correctional Center. Upon arrival, he spoke with a counselor about the cellmate incident. Vol. V at 839:22–24. Also during the course of his stay at the evaluation center he assaulted a cellmate in that facility. Vol. V at 840:16–17. After the assault Hart remained in a single cell until he was transported to the penitentiary, where he was immediately placed in a double cell. Vol. V. at 840:21–23, 841:2–11. Hart stated that he then had a confrontation with his new cellmate and "encouraged" him to move out. The cellmate left. Vol. V at 841:4–8. At some point after arrival Hart requested a single cell but a prison official denied the request. Vol. V at 841:16–842:5.

Hart has a number of physical problems. He is an insulin dependent diabetic, he has arterial sclerosis, heart disease hardening of the arteries in his leg, chronic "prostitus" and in June of 1991 had surgery on his tail bone. Vol. V. at 842:12–17. In connection with his treatment for chronic "prostitus," four or five times a day he must insert a catheter into his penis and drain his bladder. Vol. V at 843:1–6. He is unable to perform this treatment regimen in private. Vol. V at 843:10–12. This is the source of tension between Hart and his cellmates, and has led to altercations. Vol. V at 843:16–25. In respect to treatment for his tail bone condition Hart stated:

> My tail bone is exposed. I have an open wound that I now keep covered with bandages and it seeps pus and blood on a daily basis, has to be changed. The hospital issued me a contaminated plastic bag to put in my cell, and it says for blood contamination wounds only. And I have to wear rubber gloves. I change the bandages on this abscessed open sore that I have on my tail bone and I place

the bloody material and the pussy material in the plastic bag in my cell and my celly has to be in there with me.

Vol. V at 844:14–845:1. The bandages are changed about four or five times a day. Vol. V at 846:3–4. His cellmates allegedly were and are shocked and embarrassed by this (and so is he), and it is a source of tension. Vol. V at 846:22–23. Because of his medical condition, he requested a prison physician to prescribe him a single cell. There is no evidence that such a prescription was ever made. The testimony of Dr. Welke confirmed that single cells are not given to inmates for health reasons. Vol. XVIII at 3498:5–11.

Hart is homosexual and so informed staff at the evaluation unit and the penitentiary. Vol. V at 851:22–853:7. He has been celled with non-homosexual inmates. Vol. V at 852:20–22. When asked how many of his fifteen to seventeen cellmates were not homosexuals, Hart responded, "Well, I guess I could say probably four stayed non-homosexual. That would be the best way to answer it for you. In other words, out of seventeen—four out of seventeen I was unable to encourage or coerce into a homosexual act." Vol. V at 853:12–19.[6]

Hart states that he propositioned cellmate Irwin numerous times for sex, and this apparently caused problems between the cellmate and his wife and with other inmates at the penitentiary. Vol. V at 855:2–857–5, 860:21–24. Cellmates suffer because of Hart's reputation as a homosexual—the other inmates accuse Hart's cellmates of being homosexual, and it is difficult to bear such a stigma. Vol. V at 856:25–857:5, 861:13–20. Irwin eventually hit Hart on the head with a pair of crutches. Vol. V at 859:21–860:8.

Hart is also a chain-smoker (four to five packs a day), and he smokes in his cell. Vol. V at 861:23–862:12. He has had about five to six non-smoking cellmates. Vol. V at 861:15–17. Although cellmates have asked him not to smoke and even had the

---

**6.** By relating this testimony, I in no way mean to imply that homosexual inmates are any more likely than any other inmate to sexually assault a cellmate; defendants' evidence in this regard was convincing.

unit manager designate the cell as a non-smoking cell, Hart will not give up smoking. Vol. V 863:2–865:8.

On one occasion Hart was celled with an elderly man, who was overweight and had problems with his heart. Hart states that he would not let the inmate use the bottom bunk unless the inmate paid thirty dollars, and if the money was not paid, Hart made him sleep on the floor. Vol. VI at 878:11–24. In addition, on one occasion he boasts that he placed Clorox in his cellmate's eye drop solution. Vol. VI at 891:1–6. Another occasion he placed toilet bowl cleaner in his cellmate's inhaler. Vol. VI at 893:19–23. Five of Hart's cellmates have checked into protective custody. Vol. VI at 895:15–16.

Defendants provided no factual basis to conclude that Hart has exaggerated or fabricated his exploits; yet Hart has continually been double celled.

As to whether or not cellmate/cellmate attacks occur within the four main housing units, I also credit the testimony of plaintiffs Benzel Vol. I at 53:8–13 (violent cellmate confrontations are routine); Lyman Vol. I at 111:14–24, 116:13–117:9, Vol. I at 119:11–16; Bradley Vol. II at 241:7; El-Tabech Vol II at 316:11–13; Luna, Vol. III at 415:21–23; and Crisp, Vol. III at 461:5–8.

The practice of double celling is, of course, the primary factor leading to violent attacks by a cellmate on a cellmate. Inmates in double cells have been involved in a high number of violent altercations. However, there is no evidence that defendants are subjectively aware that the number of cellmate/cellmate assaults is of a significant or disproportional character because most of these assaults are not reported to them. Nevertheless, given the violent character of the institution otherwise, the lack of surveillance, and the conditions which create tension in the double cells, a reasonable prison official would be aware that cellmate/cellmate attacks are highly likely to occur in the four main housing units.

(F)

## CONTRABAND RULE

If contraband is found in a living unit shared by more than one inmate, there shall be a presumption that each of those inmates has knowledge of the presence of the contraband. Each inmate charged as a result of the discovery of such contraband shall have the burden of coming forward with evidence to rebut the presumption.

Exhibit 2, Title 68, Chapter 5 Code of Offenses, § 004.03 (contraband rule).

Under the contraband rule it is possible that an inmate who has no knowledge that any contraband is in the cell will be found guilty of possessing contraband which a cellmate or other inmate has secreted inside the cell; but that possibility has not been shown to occur with any noteworthy frequency. The evidence establishes that a disciplinary committee which hears charges of misconduct relating to the possession of contraband typically will not find an inmate guilty of misconduct if the contraband was discovered in an area over which his cellmate exerts control. Exhibit 76; Vol. VII 1177–78. Also as a matter of practice, when a cellmate admits the contraband is his, the charges are dismissed against the other inmate. Exhibit 73; Vol. I at 55:8–21, Vol. II at 162:12–23, Vol. III at 377:10–17, Vol. III at 539:21–540:2. Nevertheless, the possibility that an inmate will be punished because of the misconduct of his cellmate—misconduct that the inmate may be entirely unaware of—causes an increase in tension between persons who are double celled.

(G)

## DESTRUCTION OF PERSONAL PROPERTY BY CELLMATE

Plaintiffs Benzel and Dittrich testified that they have never had property taken or destroyed while double celled. Vol. I at 54:1–7, Vol. III at 538:5–8. Plaintiff Bradley testified that he has had property taken, but never indicated that the property was taken by a cellmate. Vol. II at 212–217. He also stated that an inmate is per-

mitted to have a locked storage area in the cell if he purchases a lock. Vol. II at 245:8–10. Plaintiff Duff testified that personal property was taken on two occasions (an orange on one occasion and some chips and popcorn on another). Vol. II at 291:16–25. However, he also stated that he did not report these incidents to prison officials. Vol. II at 292:8. Finally, plaintiff Carter on one occasion caught his cellmate reading Carter's legal papers. Vol. IV at 583:5–7. The evidence put forth by the plaintiffs on this condition does not support any finding that this condition adversely impacts the practice of double celling in the four main housing units.

### (H)

### PRIVACY

The lack of privacy in the small, cramped double cells of the four main housing units creates a major source of tension. Privacy is a rare commodity at the institution, and privacy is practically non-existent for someone who is double celled.

A number of the limitations on privacy are beyond the inmates' control. Plaintiffs must use the toilet in the presence and view of their cellmates. Cellmates must dress and undress in front of each other with scarce room to move about. Vol. I at 86:13–88:2, Vol. II at 133:3–5, 292:13–17, 293:5–7, Vol. III at 409:1–22, Vol. IV at 625:17–22. Some medical problems can be particularly discomforting, such as those described by plaintiffs Hart, Bradley (must put on or apply certain medically prescribed items in private areas under full observation of cellmate, Vol. II at 201:7–13), and Duff (cellmate is on a kidney dialysis and has to defecate five to ten times a day, flatulates constantly, has vomiting spells, and no air spray or disinfectant is allowed, Vol. II at 294:1–17). From a wide assortment of sounds and smells there is simply no relief. *See e.g.* Vol. IV at 625:17–22.

Other problems of privacy can be controlled but require cellmates to cooperate or make necessary arrangements. Vol. IV at 587:1–5. For instance, a non-smoker can designate his cell as non-smoking under the penitentiary's smoking policy. If his cellmate smokes, the non-smoker can report this violation to prison staff. However, it is possible that the non-smoker and the smoker could make some arrangement to limit the amount of smoking in the cell during the times they are in the cell together. Difficulties with cellmates who masturbate in the presence of their cellmate, Vol. II 134:2–10, 297:6–8; engage in sexual activity with other inmates inside the cell, Vol. II at 187:7–10, Vol. III at 410:21–411:3, 426:21–427:9; possess hygiene deficiencies, refuse to turn the television off at night or make other gestures of non-cooperation are also challenging intrusions to privacy.

### (I)

### SCREENING OF CELLMATES PRIOR TO PLACEMENT IN A DOUBLE CELL

One of the conditions most easily addressed by prison officials is the decision of which inmates are to be celled together.

The first stop for adult males sentenced or transferred to the state's correctional system is the Diagnostic and Evaluation Center of the Lincoln Correctional Center. It is at this institution where initial classification of the inmate takes place. Initial classification at the evaluation unit is done by groups of case managers, associate psychologists, medical staff, mental health staff, and custody personnel. They examine information received from the courts, specifically the presentence investigation report and the official court orders or commitment papers; conduct personal interviews with the inmate; gather and review social information from the families and the community; and require the inmate to undergo medical, dental, and psychological examinations. Vol. IX at 1703:9–1704:2.

A classification study is then prepared. It summarizes the legal aspects of the official commitment, past criminal information, medical history, and a psychological evaluation; identifies needs and problem areas; and makes recommendations as to specific programs designed to meet the needs to be addressed. Vol. IX at 1704:9–16. A scoring instrument is also prepared. It provides a short-hand compilation of the fac-

tors addressed in the study. Exhibit 328 at 55, 56, Vol IX at 1710. Both documents are sent to the institution to which the inmate is sent. There have been times when classification studies did not arrive with the inmates upon their transfer to the penitentiary. Vol. IX at 1718. However, the scoring instrument has always arrived, and it provides a list of personal risk factors. Vol. IX at 1719.

The personal risk factors include potential for suicide attempts, propensity for violence towards staff or other inmates, victim potential of the inmate, escape risks, security risks, and drug and alcohol abuse. They are indications which could alert staff to potential problems. Vol. IX at 1714–15. The scoring instrument is in a check-the-box format and provides no explanations. Vol. IX at 1743. The form is used to keep obvious problem inmates away from each other (inmates the incoming inmate has identified as a threat). At present the initial classification system is used only to determine the institution to which an inmate will be sent. Vol. IX at 1751–53. Beyond that, neither the study nor the instrument is used to predict compatibility of inmates.

Defendant Gunter and defendants' expert witness both testified that inmate compatibility is easy to predict. Vol. XIV at 2788:23–2789:19, Vol. XVI at, 3087, 3231,. Both witnesses noted what factors can be used to make such predictions. *Id.* Defendants' witness Tewes noted, "Classification is basically a management tool of an adult or of a correctional facility. By properly assigning and placing inmates, you are able to reduce management problems with respect to managing the inmate population." Vol. IX at 1700:1–5. During the initial classification process the information necessary to make assessments about the factors which can help predict inmate compatibility are gathered; nevertheless, the information is not used for that purpose.

There was divergent testimony as to how officials at the penitentiary assign cells to new inmates arriving into the four main housing units. Each housing unit manager tries to maintain a racial balance in each unit. Vol. VII at 1200:18–23, 1203:1–19, Vol. XII at 2298. Frequently the housing unit managers, who make the placement decisions, are able to recognize names of inmates who have been previously incarcerated. *Id.* at 2299. When this occurs, they are able to rely on their prior knowledge of the inmate and their current knowledge of the occupants of cells available for double celling. Dangerous cell arrangements can be avoided because of this ability to rely on experience. When no prison official is familiar with the incoming inmate, that inmate will be subject to a random placement unless the incoming inmate can identify a particular inmate with whom he should not be celled. *Id.* at 2321–22, 2335, 2337, 2342. In other words, in those situations the only factor considered by the officials placing the incoming inmate into a cell is space availability. Vol. VII at 1199:25–1200:13.

An inmate who is doubled celled and desires to change cellmates can do so. If the inmate can identify a particular threat to the security and order of the institution, the inmate will most likely be moved regardless of whether he can find a new cellmate on his own. Otherwise, in order to change cellmates, an inmate must find another inmate who will agree to trade cells or an inmate with whom he can move in. A move to a cell which is already occupied by two inmates—a trade situation—requires approval of prison staff and of the four inmates who live in the affected cells. If an inmate does not have a cellmate and would like to cell with a particular inmate, both inmates must consent to the move and prison staff must approve. Administrative requirements which underlie these types of cell changes do not either prevent inmates from changing cells or increase exposure to violent attacks.

The pretrial order identifies several alleged sources of alleged incompatibility. Plaintiffs assert that homosexual and heterosexual inmates cannot coexist in a double cell, but sexual preference was not shown by the evidence to be an indicator of an ability to peacefully live with another individual in close quarters.

The celling together of smoking and nonsmoking inmates is a problem. At present, space availability prevents prison officials from celling non-smokers with non-smokers

each time such a situation is requested. In response, prison officials permit the non-smoking inmate to designate his cell as a non-smoking cell regardless of the smoking inmate's wishes. If the smoker fails to comply and is reported or caught smoking, he is subject to discipline. This is an imperfect solution and can contribute to the amount of tension between cellmates. Vol. II at 333:5–17.

The next two categories of alleged incompatible pairings are between assaultive and non-assaultive inmates and inmates with varying backgrounds in respect to institutional conduct. For purposes of review, I shall treat the assaultive inmates and inmates with negative institutional records as being similarly hard to manage. The testimony of defendant Peart indicates that inmates who are management problems do not necessarily require a single-cell placement. Vol. XIII at 2524–27. If a cellmate could be found to neutralize the disruptive tendencies of the problem inmate, a workable double-celling arrangement can be achieved. *Id.* In order to accomplish this, prison officials must make some investigation into the background of the inmate to be celled with the problem inmate. This can be done with inmates already in the housing units or those with whom the prison staff has had previous experience. This cannot be done in other cases, because of the lack of any study of the compatibility factors of the newly arriving inmates. In the four main housing units no consideration in cell assignments is given to the incoming inmate's criminal record or to whether he is maximum or medium custody.

### (J)

### TIME SPENT IN CELL

Inmates in the four main housing units are required to be in their cells (locked down) for a minimum of ten to fourteen hours a day. Vol. I at 26:13–19, 106:4–10, Vol. II at 311:16–19, Vol. III at 473:25–475:3, Vol. IV at 571:10–572:11. This problem, in conjunction with the lack of privacy, limited cell size, and noise, can and does lead to violence between cellmates.

7. The rule has subsequently been amended, ef-

### (K)

### SANITATION

Plaintiffs presented no evidence that the housing units are anything but clean and sanitary.

### (L)

### LAUNDRY SERVICES

There was no sufficient evidence presented that the laundry services are deficient and if so, that this deficiency worsens the problems with double celling in the four main housing units.

### (M)

### CLOTHING

Plaintiffs are not denied adequate clothing.

### (N)

### LIGHTING

Plaintiffs are not denied adequate lighting.

### (O)

### MEDICAL STAFF

The medical staff is sufficient to meet the medical needs of plaintiffs and has not been taxed beyond its limits by the overcrowding that exists in the penitentiary. Plaintiffs' testimony as to this condition amounted to no more than a series of disagreements with medical experts about the course and efficacy of their treatment. Such claims are not related to the problems with double celling in the four main housing units.

### III.

### DISCUSSION

■ At the close of plaintiff's presentation of evidence defendants moved to dismiss pursuant to Fed.R.Civ.P. 41(b), which provides that in an action tried by the court without a jury, after the plaintiff "has completed the presentation of evidence, the defendant, . . . may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief." [7]

fective December 1, 1991.

Under Rule 41(b), the court as trier of the facts may determine them and render judgment accordingly. Unlike the more stringent standard for a defense motion for directed verdict at the close of a plaintiff's case in a jury trial, a Rule 41(b) motion does not require a trial court to weigh the evidence in the light most favorable to plaintiff. *Figgous v. Allied/Bendix Corp., Allied–Signal,* 906 F.2d 360 (8th Cir.1990) (per curiam). The motion was taken under advisement when made. The sole claim upon which plaintiffs have met their burden of proof was sufficiently supported in plaintiffs' presentation of evidence to withstand the Rule 41(b) motion. Because I find in favor of the defendants as to the remaining claims, there is no need to consider these claims separately under Rule 41(b).

### (A)

### DUE PROCESS AND THE CONTRABAND RULE

Plaintiffs' due process challenge to the contraband rule is premised on the assertion that the rule unconstitutionally saddles an inmate charged under the provisions of that rule to not only prove that he is innocent but to prove a negative as well (no awareness of item's existence). Plaintiffs' difficulty with the application of the rule goes to the possibility that an inmate will be found guilty in the absence of any evidence of his ownership because he is unable to prove he is innocent. As such, plaintiffs do not challenge the sufficiency of the process afforded to them in the sense that they are denied an opportunity to fairly present their side of the story to a fair and impartial decision maker. *See Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). Rather, plaintiffs claim that because of the shifting of the burden of proof, a misconduct finding may be based on insufficient evidence.

The evidence established that in most cases assignments of burden of proof did not play any factor in the determination of guilt. When an inmate admitted sole pos-

session of an item or the item found was in an area of the cell under the exclusive control of only one inmate, as a matter of general practice the cellmate was absolved of liability.[8] However, plaintiffs are correct that there is a theoretical possibility that under a literal application of the rule an inmate could be found guilty in the absence of any evidence at all.

Prison disciplinary proceedings, although they involve significant liberty interests, are not criminal trials, and the full panoply of procedural and substantive protection applicable in the latter context do not necessarily apply in the former. *Wolff v. McDonnell,* 418 U.S. at 567–68, 94 S.Ct. at 2980. A disciplinary proceeding balances the need for protection of the inmate's liberty interests against the legitimate penological need for "swift discipline" in particular cases. *Ponte v. Real,* 471 U.S. 491, 495, 105 S.Ct. 2192, 2195, 85 L.Ed.2d 553 (1985). While *Wolff* set forth a number of procedural safeguards to protect inmates from arbitrary government action in the disciplinary setting, neither a specific burden of proof requirement nor a standard of proof was among them.

The Supreme Court has subsequently set forth the standard of proof necessary for due process purposes in a disciplinary setting. *See Superintendent v. Hill,* 472 U.S. 445, 454–55, 105 S.Ct. 2768, 2773, 86 L.Ed.2d 356 (1985) (a federal court must uphold the decision of the disciplinary committee as a matter of due process if there is "some evidence in the record" to support the decision, specifically noting that *Wolff* did not establish any particular quantum of evidence required to support a factfinder's decision); *Mason v. Sargent,* 898 F.2d 679 (8th Cir.1990) (due process is satisfied if there is any evidence in the record which supports the disciplinary decision).

The contraband rule at the penitentiary is not *per se* unconstitutional. *Cf. Mason supra* (joint possession of contraband item may provide sufficient evidence for finding of guilt). The court's discus-

---

**8.** I make no findings as to individual incidents presented in this case but only a general finding on the practice as it has usually been applied.

sion in *Mason*, though not explicitly applicable to this contraband rule, convinces me that if faced with a general attack upon it, the rule as written would survive constitutional scrutiny. *Id.* at 680. Application of the contraband rule could potentially lead to a finding that an inmate has violated prison rules without sufficient proof. In such a situation, an inmate has available state court remedies and an action in this court in which to challenge the sufficiency of the evidence. Plaintiffs remain free to challenge the sufficiency of individual determinations of guilt in separate actions, but no such claims have been proven in this action.

### (B)

### CRUEL AND UNUSUAL PUNISHMENT

### (1)

### GENERAL

■ Double celling can be viewed as cruel and unusual punishment only if it leads to deprivations of essential food, medical care, or sanitation, or if it increases violence among inmates or creates other conditions intolerable for prison confinement. *Cody v. Hillard*, 830 F.2d 912, 914 (8th Cir.1987) (en banc), *cert. denied*, 485 U.S. 906, 108 S.Ct. 1078, 99 L.Ed.2d 237 (1988); *Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981). A court must determine whether conditions of confinement alone or in combination[9] involve wanton and unnecessary infliction of pain, or are grossly disproportionate to the severity of the crimes for which the inmates have been imprisoned. *Rhodes, supra.* The Eighth Amendment's prohibition of cruel and unusual punishments " 'draw[s] its meaning from the evolving standards of decency that mark the progress of a maturing society,' and so admits of few absolute limitations." *Hudson v. McMillian*, —— U.S. ——, ——, 112

S.Ct. 995, 1000, 117 L.Ed.2d 156 (1992) (quoting *Rhodes*, 452 U.S. at 346, 101 S.Ct. at 2398 which in turn quoted *Trop v. Dulles*, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958) (plurality opinion)).

Plaintiffs have attempted to show that double celling in the four main housing units has led to deprivations of essential human services and intolerable conditions. They have also tried to show that double celling created intolerable conditions relating to an alleged violent atmosphere at the penitentiary. In addressing the relationship between double celling and violence, plaintiffs have further sought to prove an Eighth Amendment violation by fusing together a double celling claim with a traditional failure-to-protect claim.

■ The law governing failure-to-protect claims is well established in this circuit. An inmate has a right to be free from physical attack by other inmates, and prison officials have a duty to prevent such attacks. This duty is not absolute; it is breached only if they act with deliberate indifference toward the safety of an inmate. *Andrews v. Siegel*, 929 F.2d 1326 (8th Cir.1991); *Bailey v. Wood*, 909 F.2d 1197 (8th Cir.1990); *Vosburg v. Solem*, 845 F.2d 763, 765–66 (8th Cir.1988), *cert. denied*, 488 U.S. 928, 109 S.Ct. 313, 102 L.Ed.2d 332 (1988); *Thomas v. Booker*, 784 F.2d 299, 303 (8th Cir.1985) (en banc), *cert. denied*, 476 U.S. 1117, 106 S.Ct. 1975, 90 L.Ed.2d 659 (1986).

■ Mere inadvertence or negligence does not amount to deliberate indifference and will not suffice to state a claim under section 1983 for the failure to protect an inmate. *Davidson v. Cannon*, 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986); *Andrews v. Siegel, supra.* Deliberate indifference requires showing either that prison officials actually intended to deprive

---

9. To the extent that the Supreme Court in *Wilson v. Sieter*, 501 U.S. ——, —— – ——, 111 S.Ct. 2321, 2326–27, 115 L.Ed.2d 271 (1991) may have suggested that an Eighth Amendment inquiry may no longer take into consideration the totality of a number of conditions, in contravention to *Rhodes*, the Supreme Court disclaimed such an interpretation in *Hudson v. McMillian*, —— U.S. ——, —— – ——, 112 S.Ct. 995, 999–1001,

117 L.Ed.2d 156 (1992) (*Wilson* Court was presented with no issue beyond whether an Eighth Amendment claim requires a showing of a culpable state of mind on the part of prison officials in an Eighth Amendment challenge to prison conditions; there was no change in the Supreme Court's precedents on the "objective" component of an Eighth Amendment claim).

an inmate of some constitutional right, or that they acted with reckless disregard of the inmate's right to be free from the violent attacks of fellow inmates. *Andrews v. Siegel, supra.* To establish "reckless disregard," an inmate must show that prison officials were aware of a pervasive risk of harm to an inmate and failed to reasonably respond to that risk. *Id.; Vosburg, supra; Porm v. White,* 762 F.2d 635 (8th Cir.1985); *Martin v. White,* 742 F.2d 469 (8th Cir. 1984).

■ In considering the constitutionality of the practice of double celling in the four main housing units, appropriate deference must be given to prison officials. "Prison administrators ... should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 535, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1979). *See also Cody,* 830 F.2d at 913–14. The broad latitude given to prison administrators, however, is not *carte blanche,* as Justices Brennan, Blackmun and Marshall poignantly cautioned in their concurring and dissenting opinions in *Rhodes.* In *Martin v. White, supra,* Judge Ross gave this *caveat:*

> [T]he failure of the authorities to adequately deal with the problem of prison assaults counsels us to not be hesitant to find a constitutional violation, if one exists, and to provide an adequate remedy for the violation. In sum, we "have learned from repeated investigation and bitter experience that judicial intervention is *indispensable* if constitutional dictates—not to mention considerations of basic humanity—are to be observed in the prisons." *Rhodes,* 452 U.S. at 349, 101 S.Ct. at 2400 (emphasis in original).

742 F.2d at 473 (footnote omitted). The Constitution entrusts in the courts a stewardship of decency, a role that must weather societal indifference to prison conditions. The responsibility to remedy violations of the Constitution cannot be abdicated.

### (2)
### ESSENTIAL SERVICES AND INTOLERABLE CONDITIONS

■ As noted, plaintiffs have attacked the practice of double celling in the four main housing units on two fronts. On one front, plaintiffs contend that double celling has taxed the penitentiary beyond its limits to provide essential human services, resources, and an adequate physical structures to house plaintiffs. On the other, plaintiffs assert an Eighth Amendment violation in respect to the protection afforded plaintiffs from violence associated with double celling.

In respect to the first of these approaches, the evidence was lacking. Inmates in the four main housing units are not deprived of adequate laundry service, clothing, medical personnel, or other essential human services necessary to meet their needs. Nor do I find that, as related to double celling, the conditions of noise, ventilation, correctional staffing, contraband policy, alleged destruction of personal property by cellmates, privacy, cell time, sanitation, or lighting, either alone or in combination amount to wanton and unnecessary infliction of pain, or are grossly disproportionate to the severity of the crimes for which the inmates have been imprisoned. In reaching this conclusion, I am cognizant that conditions at issue in this action from the opening of the four main housing units over a decade ago to the present have undergone considerable changes, some of them for the worse. I make no finding as to how far the Constitution might permit this trend to go; I conclude only that the conditions shown by the evidence did not violate the Eighth Amendment.

### (3)
### PROTECTION FROM VIOLENCE ASSOCIATED WITH DOUBLE CELLING

Plaintiffs contend that double celling has increased violence among inmates, particularly within the double cells, and that defendants have been deliberately indifferent to the resulting threat to plaintiffs' safety.

■ To the extent that plaintiffs have attempted to show that double celling is the cause of an increase in violence institution wide, their evidence was insufficient. The evidence did not establish any cause-effect relationship between the practice of double celling and the increase in violent assaults at the penitentiary. Any such claim should be rejected.

The remaining violence claims relate only to the conditions within the double cells. Plaintiffs claim that defendants have been deliberately indifferent by failing to develop adequate protection policies in light of the conditions that exist in the four main housing units. The claim is systemic in nature as opposed to an assertion that defendants have failed to respond to a particular risk to a particular plaintiff. *See e.g. Porm v. White*, 762 F.2d at 638. Additionally, plaintiffs do not contend that any defendant actually intended to deprive plaintiffs of the right to be free from attack by cellmates. Rather, plaintiffs claim defendants have acted in reckless disregard to that right; this requires proof of a pervasive risk of harm to inmates and of failure to reasonably respond to that risk. "A pervasive risk of harm"

> may not ordinarily be shown by pointing to a single incident or isolated incidents, but it may be established by much less than proof of a reign of violence and terror in the particular institution.... It is enough that violence and sexual assaults occur ... with sufficient frequency that prisoners ... are put in reasonable fear for their safety and to reasonably apprise prison officials of the existence of the problem and the need for protective measures....

*Martin v. White*, 742 F.2d at 474 (citations omitted); *Wilkins v. Davis*, 780 F.Supp. 646, 649 (E.D.Mo.1991), *aff'd without opinion*, 963 F.2d 377 (8th Cir.1992). *See also Bailey v. Wood*, 909 F.2d at 1199 (approving jury instruction which read "[a] pervasive risk of harm exists when violent assaults occur with sufficient frequency that the plaintiff is put in reasonable fear of his safety, and prisoner [sic] officials ... should be reasonably apprised of the need for protective measures.").

In *Martin v. White, supra*, the Eighth Circuit reversed the decision of the trial court granting a directed verdict in favor of defendant White. The two plaintiffs after having recently arrived at their institution became victims of sexual assaults. They sued Carl White, the Superintendent of their institution for failing to protect them. Plaintiffs alleged four failings in White's exercise of his oversight responsibilities: First, guards could see into cells only when on patrol and patrol procedures were not adequate especially at night. Second, there was no adequate system of classifying inmates; assaultive and non-violent inmates were housed together in the general population. Third, staff did nothing to check and fix the locks on the cells which could be and were easily picked by inmates. Fourth, assaults were not reported to the authorities for criminal prosecution. 742 F.2d at 471.

The court in *Martin v. White, supra*, found a pervasive risk of harm existed on the basis that the frequency of attacks in the institution were above an unavoidable level, new inmates were an identifiable group of prisoners prone to risk of harm, and prison officials were sufficiently apprised by the pervasiveness of assaults to be aware of the need for protective measures. *Id.* at 471–72. The court also determined that the there was sufficient evidence that White had failed to reasonably respond to the pervasive risk. In particular, it was not reasonable to place guards where they could provide little protection, fail to report assaults to the prosecutor, and not develop a policy for discovering defective cell locks. Because inmates could freely enter one another's cell by picking the locks, the court found no need to address the adequacy of classification system for the segregation of inmates. *Id.*

In *Vosburg v. Solem, supra*, the challenged institution used double celling but had no screening procedure to separate inmates by whether they were violent or non-violent, the nature of the crime they committed, or the psychological profile of incoming inmates to include potential for victimization. The institution also had a high frequency of assaults; visibility into the cells was limited; and assaults were not

reported to authorities for criminal prosecution. 845 F.2d at 765–67. The plaintiff in that case entered the institution at nineteen years of age for the offense of possessing a stolen motor vehicle. He weighed approximately one hundred and thirty-five pounds. He was double celled with an inmate who had strangled his mother to death. The cellmate raped the plaintiff, and after word of this spread through the prison, plaintiff was subsequently raped by three other inmates on three other occasions. *Id.*

As to the existence of pervasive risk of harm, the court held that the frequency of attacks in the institution were substantial enough to put the defendants on notice of the danger faced by plaintiff of attack from other inmates. *Id.* One of the prime components of the court's finding that defendants had failed to reasonably respond to that risk was the failure to implement a sufficient screening procedure for incoming inmates. *Id.* Other factors were a policy that permitted inmates to bring other inmates to isolated areas were no guards were stationed, inadequate monitoring of cells, and the failure to seek criminal prosecution of attackers. *Id. See also Walsh v. Mellas*, 837 F.2d 789 (7th Cir.), *cert. denied*, 486 U.S. 1061, 108 S.Ct. 2832, 100 L.Ed.2d 933 (1988) (failure to screen inmates to insure compatibility with cellmates constitutes punishment within the meaning of the Eighth Amendment); *Carver v. Knox County, Tenn.*, 753 F.Supp. 1370, 1388 (E.D.Tenn.1989), *aff'd in part, rev'd in part*, 887 F.2d 1287 (6th Cir.1989), *on remand*, 753 F.Supp. 1398, *cert. denied*, 495 U.S. 919, 110 S.Ct. 1949, 109 L.Ed.2d 311 (1990) (required implementation of a classification system); *Gilland v. Owens*, 718 F.Supp. 665, 686–88 (W.D.Tenn.1989) (inadequate classification system contributed directly to violence); *Fisher v. Koehler*, 692 F.Supp. 1519 (S.D.N.Y.1989) (required injunctive relief of a court-approved classification policy for Eighth Amendment violation), 718 F.Supp. 1111 (ruling on injunctive relief), *aff'd*, 902 F.2d 2 (2nd Cir.1990) (per curiam); *Monmouth County Correc-*

*tional Inst. Inmates v. Lanzaro*, 695 F.Supp. 759 (D.N.J.1988) (jail officials required to implement classification system), *amended in part, clarified in part*, 717 F.Supp. 268 (1989); *Grubbs v. Bradley*, 552 F.Supp. 1052, 1124 (M.D.Tenn.1982) ("if proof shows a sufficient connection between an improper classification system and a protected constitutional right, such as the right to be free from excessive violence, there may be just cause for court intervention").

The level of violence in the four main housing units exceeds what can be characterized as an unavoidable level. That violence has carried over into the double cells where tensions are increased by the limited cell size, noise, lack of privacy, restricted surveillance of the inmates confined therein, deterrents to the reporting of assaults and other violations of prison rules by a cellmate, suspicions about the presence of contraband, and the large amount of time spent confined on a lockdown status with a cellmate. The amount of violence and threatened violence as well as the presence of the factors that fuel them are sufficient to conclude that a pervasive risk of harm exists in the four main housing units, a risk of such magnitude as to put defendants on notice of its existence.

Plaintiffs have also sufficiently proved a failure on the part of prison officials to reasonably respond to the pervasive risk of harm in the case of newly arriving inmates. Although information is gathered and compiled during the initial intake of adult male inmates into the state's prisons, that information is not considered in the placement of new inmates into the double cells at the four main housing units. This is so, even though that information can be of valuable assistance in predicting the compatibility of cellmates.

Further, the evidence supports a finding of deliberate indifference on the facts presented on the part of defendants in failing to use the classification information available to them in placing newly arriving inmates in double cells.[10] This was not a

---

10. *Compare James v. Milwaukee County*, 956 F.2d 696 (7th Cir.1992), *petition for cert. filed*, (May 12, 1992) (No. 91–1850) (classification sys-

tem that existed and permitted probation and parole violators to be housed together was not unconstitutional); *McGill v. Duckworth*, 944

negligent oversight, but a deliberate choice of alternatives made under the circumstance of a pervasive risk of harm.

Compatibility between cellmates reduces the threat of violence between them. To randomly place newly arriving inmates into double cells under the volatile conditions that exist in the four main housing units is not a reasonable response to the pervasive risk of harm. As to this circumstance, an Eighth Amendment violation has been proven. This conclusion, however, cannot be applied to other, long-term inmates in the four main housing units whose propensities for violence are or should be known to housing unit managers or others, so long as that information is used in the making of cell assignments. There was no evidence that the compatibility of these inmates is not being at least informally considered on the basis of experience. While other sources of information exist and should be consulted, no substantial threat of harm has been shown to exist from the defendants' present practice regarding these inmates.

## IV.

### QUALIFIED IMMUNITY

Defendants assert that they are entitled to immunity from suit against them in their individual capacities for damages because at all times they acted in good faith.

 Qualified or good faith immunity is an affirmative defense, on which defendants have the burden of pleading and proof. *See, e.g., Bauer v. Norris*, 713 F.2d 408, 411 n. 6 (8th Cir.1983); *Buller v. Buechler*, 706 F.2d 844, 850 (8th Cir.1983). It provides a defense from money damages to individual officials for actions which were objectively reasonable and not in violation of clearly-established constitutional law. *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). *See also Smith v. Marcantonio*, 910 F.2d

F.2d 344 (7th Cir.1991), *cert. denied,* ── U.S. ──, 112 S.Ct. 1265, 117 L.Ed.2d 493 (1992) (rejecting claim that an Eighth Amendment violation arose from the placement of young, small "snitch" in protective custody in temporary confinement along side inmates in disciplinary confinement); *Marsh v. Arn,* 937 F.2d 1056 (6th Cir.1991) (no evidence of nexus between classi-

500, 501 (8th Cir.1990) ("Prison officials are entitled to qualified immunity unless: their conduct violates a clearly established statutory or constitutional right; they knew or should have known the right was clearly established; and they knew or should have known their conduct violated that right.").

 Defendants in this action are entitled to qualified immunity. In examining the adequacy of screening practices for incoming inmates there is enough divergence among existing precedents on the constitutional necessity of classification systems to prevent me from concluding that defendants should have known that the right to an adequate classification or screening system is clearly established. *See e.g. Walsh v. Mellas, supra; Martin v. White, supra; Vosburg v. Solem, supra; Carver v. Knox County, Tenn., supra; Gilland v. Owens, supra; Fisher v. Koehler, supra; Monmouth County Correctional Inst. Inmates v. Lanzaro, supra; Grubbs v. Bradley, supra. Compare James v. Milwaukee County, supra; McGill v. Duckworth, supra; Marsh v. Arn, supra; Andrews v. Siegel, supra.* Defendants in their individual capacities should be granted qualified immunity as to plaintiffs' claims for damages.

## V.

### ELEVENTH AMENDMENT IMMUNITY

 The Eleventh Amendment bars consideration of damages against defendants in their official capacities. *See Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *Nitcher v. Does,* 956 F.2d 796, 799 (8th Cir.1992).

## VI.

### INJUNCTIVE RELIEF

 Plaintiffs have shown that the problem of celling newly-arriving inmates

fication system and violence, no evidence plaintiff was a member of an identifiable group which is at risk of assaults, and no evidence of a pervasive risk of harm); *Andrews v. Siegel,* 929 F.2d at 1330–1332 (alleged deficiencies with screening and admission procedures were not proved).

with incompatible cellmates presents a real and immediate threat of violence between them. As such, plaintiffs are entitled to prospective injunctive relief on that claim. *Martin v. Sargent*, 780 F.2d 1334, (8th Cir.1985). How to fashion that injunctive relief is a matter that is best resolved in a later proceeding, after defendants have submitted a proposed remedial plan to correct the deficiencies noted herein. I do not conclude that the practice of double celling new inmates into the four main housing units must be halted, so long as other means are available to prevent violence and protect inmates who receive threats. Selection of those measures is a matter of prison administration peculiarly within defendants' expertise. In light of the fact that defendants Hopkins and Clarke are charged with instituting policies, they are the proper defendants to be ordered to implement the court's order.

IT THEREFORE IS HEREBY RECOMMENDED, to the Honorable Warren K. Urbom, pursuant to 28 U.S.C. § 636(b), that

(1) This court enter judgment in favor of the plaintiffs as to their claim for injunctive relief premised on the failure of defendants Hopkins and Clarke, in their official capacities, to safeguard plaintiffs from the threat of violent attacks by a cellmate, and in favor of the defendants on all other claims;

(2) Defendants be granted a period of time in which to submit a remedial plan to correct the deficiency set forth herein; and

(3) This court hold any and all further proceedings necessary to ensure that injunctive relief is promptly implemented.

The parties hereby are notified that unless objection is made within *twenty* days after being served with a copy of this recommendation, they may be held to have waived any right they have to appeal the court's order adopting this recommendation.